725 P.2d 135
**Kenneth ESTES, Petitioner-Appellant,**

**v.**

**STATE of Idaho, Respondent.**

**STATE of Idaho, Plaintiff-Respondent,**

**v.**

**Kenneth ESTES, Defendant-Appellant.**

**Nos. 15931, 15932.**

Supreme Court of Idaho.

July 31, 1986.

Rehearing Denied Sept. 19, 1986.

John C. Hover, McCall, for petitioner-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., D. Marc Haws, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Kenneth Estes appeals from the district court's denial of his petition for post conviction relief and his motion for a new trial. Because we find no merit in Estes' many allegations of error, we affirm the trial court.

Although the facts of this case were extensively set out in *State v. Estes,* 111 Idaho, 423, 725 P.2d 128 (1986), Estes' direct appeal from his conviction, a full statement of the facts is helpful to resolution of the issues raised here. In the early morning hours of May 18, 1979, at approximately 2:00 a.m., Julie Ann Somerton, an 18 year old who was working in Cascade, Idaho, and staying at the Cascade Hotel, was raped. Immediately after the rape, Ms. Somerton told the bartender that Estes was her assailant. Ms. Somerton was readily able to identify Estes because the evening before Estes had offered to buy her a drink at the bar, which she had declined.

Later that same night Estes was arrested while he slept in his car along a road outside of McCall, Idaho. He was charged with assault with the intent to commit rape, and rape. Charles Nicholas was appointed to defend him. Prior to trial, Estes was released on $35,000 bond. After Estes expressly waived his right to a speedy trial, trial was set for November 29, 1979.

At trial, Julie Somerton testified as a witness for the state. She testified that Estes had entered her room and forcibly raped her four times. She also testified that Estes had accomplished this by holding a knife to her throat and threatening to kill her. She further testified that after Estes left she screamed for help.

Many parts of Julie Somerton's story were corroborated by testimony from Mr. Kirtland Kitchen, the bartender at the Cascade Hotel. Kitchen testified that Estes had offered to buy Julie a glass of wine. Kitchen also testified that Estes later inquired as to Julie's room number, and had purchased a bottle of Julie's favorite wine. He stated that after hearing Julie's screams he heard someone running down the stairs and an automobile leaving. He stated that he later noticed that Estes' car, which had previously been parked in front of the hotel, was gone. Kitchen also testified that at approximately 1:00 a.m., a short hour before the rape, Estes had rented a room for the night and had been given

a room four or five doors from Julie's apartment.

Estes, testifying on his own behalf, completely denied any involvement with the victim. While admitting that he had considered going to Julie's room, he stated that he had thought better of it and ultimately decided to leave the hotel. He testified that although he had just paid for a room, at 2:00 a.m. he decided to drive the 30 miles to McCall because he wanted to submit an application for employment at the Shore Lodge. Estes claimed that he had merely decided not to use the room. At the time he was apprehended in the early morning hours, while sleeping in his car outside McCall, Estes was in possession of a pocket knife like the one used in the rape of Julie Somerton. He also admitted that at the time of his arrest he had only $9.91 in his possession.

At his first trial, Estes called two witnesses on his behalf. The first witness, a friend of Estes, admitted on cross examination that he could recall none of the events of the evening of May 17, 1979, or the early morning hours of May 18, 1979. The second witness testified that Estes was not the man that the witness had seen outside Julie Somerton's room the night of the rape. However, on cross examination, the witness admitted that the light had been poor, that he had been drinking and was groggy, and that he had not been wearing his glasses. The testimony which this witness presented at trial differed substantially from the information the witness had given to the police the night of the rape.

After a three-day trial, the jury returned a verdict finding Estes guilty of rape. Estes remained free on bond pending sentencing. On January 7, 1980, District Judge Walters sentenced Estes to a ten year indeterminate sentence in the Idaho Penitentiary.

After the sentencing hearing, James Schoenhut was appointed to represent Estes on appeal. An appeal was filed and ten days later, on January 17, 1980, Estes was again released on bond pending his appeal. Subsequently it was determined that only part of the transcript could be located. The portion of the transcript containing the testimony of seven of the state's witnesses could not be located.[1] Accordingly, this Court vacated the district court's judgment and remanded the cause for a new trial. Meanwhile, Estes remained free on bond.

A new trial was set for January 31, 1983. At this trial Estes was represented by Schoenhut, his counsel in the earlier appeal. The record contains an affidavit from Schoenhut stating that the partial transcript of the first trial was available to Schoenhut and that Schoenhut extensively studied that transcript. That transcript included the testimony of the victim, Julie Somerton.

At the second trial, Julie Somerton again testified for the state, with Kitchen corroborating her story. The state similarly reintroduced expert testimony seeking to link Estes to the rape. Estes also testified on his own behalf again. However, the two witnesses who had formerly testified for Estes did not testify at this second trial.

On February 2, 1983, a jury again returned a verdict of guilty as to the crime of rape. It was at this time that Estes was actually taken into custody. Then, on March 4, 1983, Estes was again sentenced, receiving a seven year indeterminate sentence.

On March 16, 1983, Schoenhut filed a notice of appeal on Estes' behalf. On June 10, 1983, Estes filed a *pro se* motion for post conviction relief alleging, *inter alia*, inadequacy of counsel. Subsequently, John Hover, Estes' present counsel, was appointed. Hover represented Estes both on the second appeal and in this post conviction proceeding.

1. The tape containing testimony of state's witnesses John H. Moser, Raymond Tracy, Lawrence S. Olson, Barry W. Brightwell, Gary E. Mills, Ann Bradley and Pam Southcomb was inadvertently erased before it was transcribed. The remainder of the trial was transcribed and was available.

On July 9, 1984, the district court denied Estes' motion for post conviction relief on several grounds but left open, pending an evidentiary hearing, the question of whether Estes had effective assistance of counsel. On November 14, 1984, Estes filed a motion for a new trial pursuant to Idaho Criminal Rule 34. After an evidentiary hearing the district court, on February 20, 1985, denied Estes' motion for a new trial as well as Estes' motion for post conviction relief. Estes' direct appeal from his conviction was considered by this Court in *State v. Estes*, 111 Idaho 423, 725 P.2d 128 (1986). In this consolidated appeal, Supreme Court Nos. 15931–15932, we address the issues raised in Estes' appeal from the district court's denial of his petition for post conviction relief and denial of his motion for new trial.

## I

Estes alleges that he received ineffective assistance of counsel at trial. In support of this argument, he points to what he alleges are several "glaring" deficiencies, the "cumulative effect" of which, he alleges, "reflect a reasonable probability that appellant was damaged through ineffective assistance of counsel." We disagree.

The United States Supreme Court has enunciated the standards to be used in determining whether a defendant received effective assistance of counsel at trial. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court stated:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. at 2064.

As the Court further stated:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–34, 102 S.Ct. 1558, 1574–75, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *See Michel v. Louisiana*, 350 U.S. [91] at 101, 76 S.Ct. [158] at 164 [100 L.Ed. 83]." *Id.* 104 S.Ct. at 2065–66.

While declining to furnish specific guidelines, the Court noted:

"The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court

**434**

should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 2066.

As to the duty to investigate, the court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 2066.

■ This Court has also addressed the question of what constitutes effective assistance of counsel. In short, a defendant is entitled to the reasonably competent assistance of an attorney. *State v. Tucker,* 97 Idaho 4, 8, 539 P.2d 556, 560 (1975). *Accord Strickland v. Washington,* 466 U.S. at 686, 104 S.Ct. at 2064. "A showing that defendant was denied the reasonably competent assistance of counsel is not sufficient by itself to sustain a reversal of the conviction. The defendant, in most cases, must make a showing that the conduct of counsel contributed to the conviction or the sentence imposed." *State v. Tucker,* 97 Idaho at 4, 12, 539 P.2d at 564 (1975); *see also State v. Tisdel,* 101 Idaho 52, 54, 607 P.2d 1326, 1328 (1980). We have also repeatedly stated that we will not attempt to second-guess strategic and tactical choices made by trial counsel. *State v. Larkin,* 102 Idaho 231, 233, 628 P.2d 1065, 1067–68 (1981); *State v. Tucker,* 97 Idaho at 10, 539 P.2d at 562.

[2] These standards, articulated by both the United States Supreme Court and this Court, must be used to determine whether Estes received effective assistance of counsel. As the Supreme Court has stated, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. The presumption in evaluating attorney effectiveness is that the attorney is competent and that his actions represent sound trial strategy. A defendant shoulders a difficult burden when he seeks to assert ineffective assistance of counsel.[2] Here, a complete reading of the record reveals that the trial court correctly concluded that Estes did not carry his burden.

■ It is not enough for Estes to show that his counsel's performance *might* have been better, and *might* have contributed to Estes' conviction. Rather, under either the standard articulated by the Supreme Court or this Court, Estes must show *actual unreasonable representation and actual prejudice.* Here such prejudice has not been shown. Simply put, the trial court in the post conviction proceeding, after hearing the evidence, concluded that Estes was convicted because his story appeared to be somewhat preposterous in light of the testimony of the victim which was amply corroborated by other witnesses and evidence.

■ The evidence, viewed most favorably to the trial court's findings as it must be viewed on appeal, reflects that defendant Estes approached the victim earlier in the evening of the rape trying to buy her a drink in the hotel bar, and then later in the evening, shortly before the rape occurred, asked the bartender what her room number was. He then checked into the hotel, bought a bottle of wine which he had been advised was her favorite brand, and went upstairs from the bar to where both his room and the victim's room were located. Approximately an hour later, the bartender

---

2. As Justice Huntley recently stated in *State v. Alanis,* 109 Idaho 884, 712 P.2d 585 (1985) (Huntley, J., dissenting):

"Under the holding of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant in order to succeed with a claim of ineffective representation must show the existence of a reasonable probability, but for defense counsel's errors, the result would have been different. This is a very difficult standard to meet." *Id.* at 890, n. 2, 712 P.2d at 591, n. 2.

heard the victim's screams, heard someone running down the stairs, and observed that Estes' automobile, which had been parked in front of the hotel, was gone. Within a short time thereafter the defendant was found sleeping in his car near McCall, Idaho, in possession of a knife substantially identical to that described by the victim shortly after the rape. The victim was clearly able to identify the defendant Estes as the rapist because of his earlier attempts in the evening to befriend her. Regardless of Estes' allegation that he was prejudiced by counsel's "cumulative error," the bare fact remains that Estes' story was unbelievable, and two separate juries and one trial judge have so found. Accordingly, the record sustains the trial court's finding that Estes' conviction was not the result of any alleged incompetent counsel, but resulted from the strong identification testimony of the victim, corroborated by other witnesses at the scene, and Estes' totally unbelievable explanation for leaving the hotel right after he had checked in and paid cash for his room, only to be found sleeping in his car.

■  Estes finds fault with Schoenhut's trial preparation. However, Estes ignores the fact that Schoenhut assumed this case after Estes had already been tried once. The record reflects that extensive discovery was conducted in anticipation of the first trial. Having assumed this case as Estes' attorney on appeal from the first trial, Schoenhut undoubtedly was privy to the results of this discovery material. Moreover, an affidavit submitted by Schoenhut indicates that Schoenhut carefully read the available portions of the transcript of the first trial, a transcript which contained the entire testimony of Julie Somerton, testimony which had been subjected to scrutiny under cross examination. While an interview with Ms. Somerton might have been helpful, Schoenhut's decision not to interview her under the facts of this case was not clearly improper where he had an opportunity to study her prior sworn testimony.

■  Nor are we convinced that Schoenhut's failure to investigate Julie Somerton's prior sexual contacts constitutes inadequacy of counsel. Such evidence is generally inadmissible under I.C. § 18–6105. It must be remembered that Estes was the defendant at trial, not Julie Somerton. Further, as the district court accurately noted when denying Estes' motions:

"Estes had tried to get Julie to drink with him in the bar. The Defendant left the hotel in his car just after the alleged rape. His own testimony indicated he had seduction of Julie Somerton in mind when he left the bar with a bottle of her favorite wine. Estes had a pen knife like the one used in the rape. With all this evidence and more to corroborate the testimony of Julie Somerton, it would seem that notwithstanding defense counsel could have been much tougher on Julie Somerton in cross-examination if he had been better prepared, Estes failed to show prejudice in the light of all the other evidence corroborating her testimony."

Estes also finds fault with Schoenhut's investigation of "the state's voluminous scientific evidence." In considering this issue, we are mindful of the Supreme Court's mandate that competency of counsel is to be presumed. Schoenhut interviewed the state's witnesses almost immediately after he was appointed as counsel. This is just the sort of prompt investigation which is expected under existing state law. *See State v. Larkin,* 102 Idaho 231, 233, 628 P.2d 1065, 1067 (1981). As to the need for additional investigation, the Supreme Court has stated that "a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066. Having extensively reviewed the record, we are in agreement with the district court when it stated:

"In these proceedings, Estes' present counsel was quite successful in making the scientific evidence in the case appear inconsequential except insofar as such

evidence established that a rape was committed by someone. The same evidence at the trial to this court appeared to be of little moment, except the act of rape, even though it was elaborately presented. To the court, the scientific evidence is of little consequence in establishing either the guilt or innocence of Estes. The court agrees with attorney Schoenhut that Estes' conviction occurred mainly because of the testimony of Julie Somerton which was corroborated substantially by other evidence."

A defendant in a criminal proceeding is entitled to a fair trial, not a perfect one. *Bruton v. United States*, 391 U.S. 123, 125, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). *Accord United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986).

By the same token, a defendant in a criminal proceeding is entitled to reasonably effective assistance of counsel, not perfect representation. The trial court found, and the evidence amply supports his conclusion, that Estes' conviction resulted from the credibility of the testimony of Julie Somerton and the other corroborating evidence, and the incredibility of the testimony of the defendant Estes. That conclusion is strongly supported by the record in this matter and, accordingly, we find no merit in Estes' argument that he was denied effective assistance of counsel.

## II

Estes also finds error in the district court's summary dismissal of many of the issues raised in his petition for post conviction relief. Specifically, Estes contends

that factual disputes existed with regard to a speedy trial issue, a prosecutorial misconduct issue, and a missing evidence issue, and that an evidentiary hearing on these issues was necessary.[3]

Under the Idaho Uniform Post Conviction Procedures Act, a court is not required to grant the defendant a full evidentiary hearing if the allegations contained in the petition do not entitle the applicant to relief. I.C. § 19–4906. The petitioner for post conviction relief has the burden of proving by a preponderance of the evidence the allegations which he contends entitle him to relief. *Clark v. State*, 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Having fully reviewed the record, we find no error in the trial court's summary dismissal of these allegations of error.

### A.

■ In regard to Estes' speedy trial argument, the trial court found, "Estes' contention that he has been denied his right to speedy trial has no merit insomuch as Estes waived his right to speedy trial on September 27, 1979." Our complete review of the record does indeed indicate that Estes did waive his right to a speedy trial on that date in 1979. Furthermore, from shortly after his arrest in May, 1979, until after conviction the second time in February of 1983, Estes was free on bond. Accordingly, the district court correctly concluded that an evidentiary hearing was not necessary to resolve the speedy trial issue.

### B.

■ In considering Estes' many allegations of prosecutorial misconduct, the district court found that these allegations were largely based upon mischaracterization of the evidence presented at trial. After carefully evaluating each of the alleged instances of prosecutorial misconduct, the district court concluded that none of these alleged instances of misconduct prejudiced

---

**3.** Although he did not receive an evidentiary hearing on these issues, Estes did receive an evidentiary hearing on the competency of coun-

sel issue, which he raised in his petition for post conviction relief.

Estes. The district court's opinion reveals a careful examination of the trial transcript of the second trial, as well as of the available transcript from the first trial. Since any instance of prosecutorial misconduct would be revealed by a careful study of these trial transcripts, we cannot agree with Estes that this allegation of error necessitated an evidentiary hearing.

### C.

Finally, the district court concluded that Estes was not prejudiced by the state's inability to produce certain pieces of evidence at the second trial. Specifically, these pieces of evidence were certain photographs, some of which were part of a photographic lineup used by Julie Somerton to identify Estes, and a belt which Estes was wearing at the time of his arrest.

According to Estes, had the photos been available to Estes at his second trial, he could have shown that the photographic lineup was unreasonably suggestive. In order to show that the lineup was unreasonably suggestive, presumably to ultimately force suppression of the in-court identification as well, Estes would have had to show that, under the totality of the circumstances, the lineup was so suggestive as to show a substantial likelihood of misidentification. *State v. Hoisington,* 104 Idaho 153, 161, 657 P.2d 17, 25 (1983). An evidentiary hearing was not necessary to enable the district court to properly conclude that Estes could not possibly meet this difficult burden. As the district court noted, at the first trial Julie Somerton's testimony was that, when she saw the photographic lineup, she hardly glanced at the other pictures because she immediately identified Estes as her assailant, and there was no doubt in her mind as to the identification. Given Estes' contact with Julie Somerton prior to the rape, which was corroborated, the record reflects no reason to doubt Julie Somerton's testimony. Moreover, Estes' conviction was as much the result of circumstantial evidence indicating that he was the assailant as it was the result of Somerton's identification.

Nor was an evidentiary hearing required to determine whether Estes was prejudiced by the lost belt. This belt was lost at some point prior to the first trial. At the first trial, Julie Somerton described the belt worn by her assailant as a "cowboy belt." Estes claimed that the belt which had been taken from him at his booking was a brown belt with a horseshoe buckle. Estes therefore attempted to use the discrepancy in the descriptions of the belt to show that he was not the assailant. However, assuming that there is a discrepancy between the two descriptions, as the district court noted, the belt's description is a relatively minor detail in Julie Somerton's testimony. Further, Estes' booking card indicates that the belt which was taken from Estes by the booking officer did not fit Estes' description of his belt. An evidentiary hearing on this issue would not have settled the dispute, since the belt was, and still is, missing. All that an evidentiary hearing would have provided is an opportunity for Estes to state that he was wearing a brown belt with a horseshoe buckle, while Ms. Somerton had described the belt worn by her assailant as a "cowboy belt." Since this evidence was available from the record, we agree with the district court that an evidentiary hearing on this issue was not necessary.

### III

Estes also alleges that the district court erred in refusing to allow him to obtain, at public expense, an expert witness, a private investigator, and an expert criminal defense lawyer who was to review the record and appear as a witness. In *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982), we discussed this issue. We stated:

> "It is thus incumbent upon the trial court to inquire into the needs of the defendant and the circumstance of the case, and then make a determination of whether an adequate defense will be available to the defendant without the requested expert or investigative aid. If the answer is in the negative, then the services are necessary and must be provided by the state.

Such a review necessarily involves the exercise of the sound discretion of the trial court. (Citations omitted.) Consequently, a denial of a request for expert or investigative assistance will not be disturbed absent a showing that the trial court abused its discretion by rendering a decision which is clearly erroneous and unsupported by the circumstances of the case." 103 Idaho at 395, 648 P.2d at 207. In this case, we cannot say that the decision to deny Estes expert or investigative assistance was an abuse of the district court's discretion. As the record clearly reflects, the state laboratory was available for any additional scientific testing which Estes desired. Nor can we say that Estes was deprived of an adequate defense merely because he did not have a private investigator or an expert criminal law specialist at his disposal. As this somewhat voluminous record clearly reflects, Estes' present attorney is more than competent and has quite ably represented Estes' position in both the direct appeal and the petition for post conviction relief.

## IV

Estes also alleges that the district court's memorandum decision of February 20, 1985, which was issued after the evidentiary hearing, included findings which were directly in opposition to the uncontradicted evidence presented by the state's experts. Specifically, he contests the district court's conclusion that Estes was found to be a Type O secreter by the Idaho State Laboratory. Estes asserts that this was particularly important evidence since initial testing indicated that Type O semen was found at the scene of the rape.

Where there is competent and substantial evidence to support a decision made after an evidentiary hearing on an application for post conviction relief, that decision will not be disturbed on appeal. *Lipps v. State*, 94 Idaho 185, 484 P.2d 734 (1971); *Holmes v. State*, 104 Idaho 312, 313, 658 P.2d 983, 984 (Ct.App.1983). Here, Pam Server, forensic chemist for the state laboratory in Boise, testified that Estes has Type O blood. She further testified that a

blood test performed on a sample of Estes' blood indicated that Estes was a secreter. However, Server also testified that when she ran a saliva test on a small amount of Estes' saliva there was no reflection that Estes was a secreter. When questioned about this inconsistency, she stated, "I could take a larger sample of saliva which we found there—the people that we get our training from told us that we need to take larger samples now to get better results. But consultation with somebody about possible low level secreters might be helpful." From this, we cannot conclude that the district court was clearly erroneous when it stated that the Idaho State Laboratory found that Estes was a Type O secreter. In fact, it is clear from Ms. Server's testimony that she found the results of the saliva test to be, at best, anomalous, since the blood test had clearly indicated that Estes was a secreter.

At best, Estes has only shown that his secreter status has not yet been conclusively determined. As we previously stated, an applicant for post conviction relief has the burden of proving, by a preponderance of the evidence, the allegations on which his petition is based. *Clark v. State*, 92 Idaho 827, 452 P.2d 54 (1969); *Holmes v. State*, *supra*. Estes has clearly not carried his burden of showing that he is not a secreter, as he might have done had he provided the state laboratory with a larger saliva sample before calling Server to testify on his behalf.

Estes also makes much of the fact that recent tests run on the items retained in the sex crime kit are less than conclusive on the issue as to whether or not Type O semen was found at the rape scene. However, Server stopped short of saying that the more recent tests, run on five-year-old samples which had been stored at room temperature, were accurate. In fact, Server repeatedly emphasized that degradation of the samples probably influenced the more recent test results. While Estes has been successful in raising some doubt as to the validity of the scientific evidence presented at trial, we cannot say that the

district court erred in choosing to believe that the earlier tests were more accurate.

Lastly, we do not find Estes' reliance on the "inconsistencies" in the scientific evidence to be particularly persuasive. As we have previously noted, and as the district court noted, Estes was convicted because of the victim's testimony, which was corroborated, and because his own alibi was totally unbelievable.

## V

■ Finally, we find no merit in Estes' contention that the district court erred when it denied Estes' motion for a new trial.

The motion, filed pursuant to Idaho Criminal Rule 34, alleged that newly discovered scientific evidence entitled him to a new trial. Here Estes argues that the scientific evidence was manipulated to convince the jury of probative value when there was no such value and that this has undermined his right to a fair trial. The question of whether the interests of justice require a new trial is directed to the sound discretion of the trial court and will not be disturbed absent an abuse of this discretion. I.C.R. 34; *State v. Olin,* 103 Idaho 391, 399, 648 P.2d 203, 211 (1982). In order to succeed on a motion for new trial based on newly discovered evidence, a defendant must show, *inter alia,* that the new evidence will probably produce an acquittal. *State v. Drapeau,* 97 Idaho 685, 691, 551 P.2d 972, 979 (1976). We find no abuse of the trial court's discretion here since Estes has not shown that the "new scientific evidence" will produce an acquittal.

As discussed above, Estes was convicted because of the credibility of the testimony of the victim, which was fully corroborated by the circumstances and the testimony of Mr. Kitchen, and by the incredibility of Estes' alibi. Estes has not met his burden of showing that he was convicted because of the scientific evidence or that the "new evidence" would have resulted in acquittal.

Affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice dissenting.

I dissent. This dissent explains my opposition to the majority opinions in this case as well as in *State v. Estes,* 111 Idaho 423, 725 P.2d 128 (1986).

On appeal from his second conviction, Mr. Estes contends that he was entitled to a dismissal of the charges against him because he was denied his right to appeal from the first conviction; that he was denied a transcript for use during the second trial; that the second trial placed him in double jeopardy; that he was denied the right to a speedy trial; that the prosecution introduced insufficient evidence to corroborate the prosecutrix's testimony that Estes was her assailant; that the information was deficient; that the state should have been required to elect as to the act it would rely upon for conviction; and that the prosecutor engaged in misconduct.

In November of 1985, this Court heard oral argument in Estes' consolidated appeal from the district court's denial of his petition for post-conviction relief and a motion for a new trial. In support of that appeal, Estes argued that the district court's decision in support of its denial of his motion for a new trial and petition for post-conviction relief stated facts not supported by the evidence; that trial counsel's performance was so inadequate as to deny Estes the effective assistance of counsel; that the district court abused its discretion in denying Estes' request for investigation expenses; and that the district court erred in dismissing certain post-conviction relief issues without first affording Estes an evidentiary hearing.

By this dissent, I address issues raised in both appeals, except for those issues rendered moot by today's decision. A brief recitation of the facts precedes my analysis.

## I.

On May 17, 1979, Julie Ann Somerton, then an eighteen-year-old, was working in Cascade, Idaho, and living in the Cascade

Hotel. That evening Ms. Somerton went to the Hideaway Bar located in the hotel. In the bar, she met the defendant, Kenneth Estes. Later that evening, after Ms. Somerton had returned to her room, she was raped. At trial, Ms. Somerton identified Kenneth Estes as her assailant.

Evidence consisting of Ms. Somerton's panties, a washcloth, and a bath mat were seized from her room in the Cascade Hotel and sent to the state laboratory. A "rape kit" and evidence collected from Ms. Somerton's body were also sent to the State Forensic Laboratory. The evidence sent to the state laboratory established that semen had been found in and on Ms. Somerton and her clothing, as well as on a washcloth she had used; that hair strands taken from Mr. Estes and the victim when compared to hairs found on Ms. Somerton's clothing revealed that two hairs found on the washcloth, one on her bath mat, and one found in her panties were similar to hair samples taken from the defendant and could have had a common origin.

Mr. Estes testified that he had come to Cascade on May 15, 1979, and had slept in his car that evening. The following night, he stayed with a friend. On the evening of May 17, the friend told him he was going to have a lady friend at his house and therefore he decided to stay elsewhere. Mr. Estes stated that he was at the Hideaway Bar on the evening of May 17 and, there, offered to buy Ms. Somerton a drink, which she declined. Appellant testified that, although the hour was late, he then decided to go to McCall to answer a help wanted advertisement and began driving to McCall in order to get a "head start." He pulled over to the side of the road near McCall and went to sleep. It was there he was arrested.

## II.

For reasons which I explain below, I would reverse the judgment and remand the cause with directions to the trial court to enter an order directing the warden of the state penitentiary to release and dis-charge appellant. My dissent today is grounded in my belief that on this record appellant has demonstrated that he was denied the right to effective assistance of counsel at trial and the right to a speedy trial.[1]

I begin by analyzing whether trial counsel furnished effective assistance under the standards articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which standards are set forth fully below, and further, whether counsel's performance failed to comport with the test adopted by this Court in *State v. Tucker*, 97 Idaho 4, 539 P.2d 556 (1975) wherein we stated:

> It is our opinion that the best enunciation of defense counsel's obligation is found in *United States v. DeCoster*, 159 U.S. App.D.C. 326, 487 F.2d 1197, 1202 (1973) —"a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."

*Tucker*, 97 Idaho at 8, 539 P.2d at 560.

An accused's right to representation by counsel is a fundamental component of the American system of criminal justice. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The criminal defendant is assured this right through the sixth amendment which provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend. VI. The Supreme Court has construed this clause as embodying "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1448–1449, 25 L.Ed.2d 763 (1970). Recently, in *Strickland v. Washington, supra,* the Court held that where there is a claim of ineffective assistance of counsel, an appellant must meet a two part test. The two components of this test are (1) deficient attorney performance and (2) prejudice to the defense caused by the deficient performance. *Strickland,*

1. Mr. Shoenhut was appellant's trial counsel. Mr. Hover is appellant's counsel on appeal.

466 U.S. at 687, 693–95, 104 S.Ct. at 2064, 2067–69. The *Strickland* court formulated a prejudice standard that requires the appellant to show "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The Court defined "reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.* Hence, the proper standard for evaluating attorney performance is that of reasonably effective assistance, considering the circumstances of the case. *Id.* at 687, 104 S.Ct. at 2064. The Court stated that when a convicted defendant alleges ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064–65. The court declined to furnish more specific guidelines, noting that the proper measure of attorney performance is simply reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2065.

This court has said that defense counsel's obligation "is 'to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty.'" *State v. Larkin,* 102 Idaho 231, 233, 628 P.2d 1065, 1067 (1981) (quoting American Bar Association's "Standards Relating to the Defense Function" § 41 (1971)). Here the record reflects that appellant's trial counsel interviewed witnesses at the state laboratory *three years prior* to the time of trial. He also read "some" written reports, including partial transcripts available from the earlier proceeding. He engaged in no pre-trial discovery. He failed to examine the laboratory witnesses' notes *prior* to the time of trial. He failed to request the court to appoint an expert to assist him in evaluating the state's voluminous scientific evidence and to inform him in what ways he might prepare to subject that evidence to meaningful adversarial testing. He failed to investigate the prosecutrix's background and to inquire whether she might have been engaged in any sexual activity, which activity might have led to facts indicating that someone other than the appellant was her assailant. He failed to object when the prosecutor on at least three separate occasions made remarks which were clearly objectionable. Moreover, he failed to diligently prosecute the appeal from appellant's first trial.

The district court, in its memorandum decision, stated:

> The evidence from Estes' counsel at the second trial who testified in this proceeding indicated that the victim's apparently highly credible testimony was the foremost reason why Estes was convicted. Counsel testified *he had not talked to her prior to the trial.* He also indicated he had made no intensive investigation of the background of Julie Somerton.
>
> . . . .
>
> In a trial of this kind, the testimony of a prosecuting witness is subject to the same attacks on credibility as would be the testimony of any other witness in any other criminal case. (Citations omitted.) Since the record indicates that Julie Somerton maintains she was forcibly raped, the extent of her immediate prior sexual activity, if any, could have been important to the credibility of the testimony of the prosecuting witness that she was forced.
>
> . . . .
>
> It is apparent that defense counsel was remiss in not preparing to attack the credibility of Julie Somerton. [Emphasis added.]

It is true, as the district court noted, that there was evidence in the record tending to corroborate Ms. Somerton's testimony. However, when by trial counsel's own admission it was Ms. Somerton's credibility as a witness that convicted Estes, defense counsel's failure *to prepare to challenge* her credibility cannot be deemed harmless.

The district court concluded that "not badgering a damsel in distress would certainly be a reasonable strategic decision." It is, of course, one thing to "badger"; it is another thing to effectively prepare to

442

cross-examine; and to *in fact* effectively cross-examine. I fail to understand how appellant's trial counsel could have made a "strategic" decision not to cross-examine the prosecutrix as to her background, any other sexual partners she may have had, or any other sexual activity in which she may have engaged during the twenty-four hour period preceding the rape without *first investigating* her background. A course of action can only be labeled a "strategy" when the strategian first informs himself of the underlying facts. The record reflects that the prosecutrix had a diaphragm and vaginal cream in her hotel room. At a minimum, the presence of these items would suggest that the prosecutrix was sexually active. Clearly, both chaste and unchaste individuals may be raped. However, at a minimum, the presence of these items would suggest to reasonably diligent defense counsel that further inquiry into the prosecutrix's sexual partner or partners and related activity would be in order.

Clearly, inadequate preparation of trial counsel may constitute ineffective assistance, violating a defendant's sixth amendment right to representation. *Herring v. Estelle*, 491 F.2d 125, 129 (5th Cir.1974); *State v. Osborne*, 35 Wash.App. 751, 669 P.2d 905, 911 (1983). In *State v. Radjenovich*, 138 Ariz. 270, 674 P.2d 333 (App. 1983), the court held that "[i]t offends basic notions of minimal competence of representation for defense counsel to fail to interview any state witnesses prior to a major felony trial." *Radjenovich*, 674 P.2d at 337. Here, defendant's trial counsel's only interviewing involved a brief discussion with individuals whose names he cannot now recall, about matters which he cannot now recall at the state laboratory *three years prior* to trial. As we shall see in the discussion that follows, whatever the extent of the conversation trial counsel had with the state laboratory personnel three years prior to trial, he did not obtain sufficient information to subject the state's case to meaningful adversarial testing. Any distinction between counsel's performance in *Radjenovich*, and counsel's performance in the case at bar is slim indeed.

Recently, in *In Interest of Rushing*, 9 Kan.App.2d 541, 684 P.2d 445 (1984), the court stated:

*Cronic* and *Strickland* teach presently pertinent lessons. The purpose of the effective assistance of counsel right is to afford to the party a fair trial. One element of a fair trial is subjection of trial evidence to adversarial testing; the trial must be a reliable adversarial testing process. Whether there is "actual ineffectiveness" need not be decided where there is complete denial of counsel or "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." As we see it, it is possible to say that failure to subject the prosecution's case to meaningful adversarial testing is another way of saying failure to place the prosecution on strict proof.

*Rushing*, 684 P.2d at 450 (quoting *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047). In the case at bar, I cannot conclude that appellant's trial counsel placed "the prosecution on strict proof." In this regard, I deem particularly significant the affidavits submitted by the state laboratory analysts, which affidavits were submitted to the district court in support of appellant's motion for a new trial.

Pamela J. Server's affidavit read as follows:

PAMELA J. SERVER, being first duly sworn and upon oath, deposes and says:

1. I am a Senior Criminalist, working for the State of Idaho, Department of Health and Welfare, Bureau of Forensic Laboratories, Forensic Section.

2. I was an expert witness for the prosecution in both the first and second criminal trials of Kenneth Estes.

3. I participated in the original workup of the scientific evidence introduced by the State in the two criminal trials of Mr. Estes. I have recently participated in a reexamination of that evidence.

4. In my initial examination of a saliva sample from Mr. Estes, taken before the first criminal trial, I could not detect

antigenic materials to establish that Mr. Estes can be bloodtyped through secretions. In my recent examination of a new saliva sample from Mr. Estes, the sample being obtained at the State Penitentiary, I could not detect antigenic materials to establish that Mr. Estes can be bloodtyped through secretions.

5. In my most recent testing I also ran what is known as a Lewis bloodtyping test on a whole blood sample taken from Mr. Estes. The Lewis test reflected that Mr. Estes should be able to be bloodtyped through his secretions. The Lewis test was not done prior to the criminal trials of Mr. Estes and seemingly conflicts with my findings as set forth in paragraph 4. I am unable to absolutely explain the conflicting indications and would prefer to consult with Dr. Edward Blake of California in order to possibly resolve the conflict and explain my findings. Otherwise, I would need an actual semen sample from Mr. Estes to establish whether or not Mr. Estes can be bloodtyped through deposits of semen. Mr. Estes's secretor status has not been conclusively determined at this time.

6. I examined various semen-stained samples from Julie Somerton's sex crime kit and items found at the scene of the crime. Underpants, a washcloth, a towel, and bib overalls were some of the items of evidence examined which showed semen; however, the concentration of semen currently was insufficient to determine the blood group of the semen donor. My testing did reflect an indication of a weak O activity on the washcloth, a weak A activity on the overalls, and a high A activity on the underpants.

7. *Neither in my initial examination nor my more recent examination, did I in fact conclude that the semen on the washcloth was deposited by someone of an O bloodtype.* The reflections of an O bloodtype from the washcloth might just as likely have originated from the Ortho-Gynol jelly, bacteria, dirt, detergents, sweat, or other collateral sources, including a mixture of secretions of the victim, or any combination of the preceding. Accordingly, even if Mr. Estes is an O secretor, the evidence from the scene of the crime does not firmly include or exclude Mr. Estes as the depositor of the semen that was examined.

8. *The inconclusiveness of my examination was not brought out during the trials of Mr. Estes. Defense counsel did not interview me nor did he ask the appropriate questions of me during cross-examination. I would have freely disclosed or offered the total uncertainty of my findings had I been asked to do so by defense counsel.*

9. *In summary, my findings do not indicate that the semen bloodtyping results were seminal in origin. I would be speculating should I say otherwise. I cannot associate Mr. Estes to the evidence which has been submitted from the crime scene.* [Emphasis added.]

Moreover, my examination of the record reflects that Mr. Estes' trial counsel did not prepare to cross-examine Ms. Server and, in fact, did not cross-examine Ms. Server so as to bring before the jury the fact that her examination of the scientific evidence was inconclusive.

Ann R. Bradley submitted the following affidavit:

ANN R. BRADLEY, being first duly sworn and upon oath, deposes and says:

1. I am a Senior Criminalist, working for the State of Idaho, Department of Health and Welfare, Bureau of Forensic Laboratories, Forensic Section.

2. I was an expert witness for the prosecution in both the first and second criminal trials of Kenneth Estes.

3. I participated in the original work-up of the scientific evidence introduced by the State in the two criminal trials of Mr. Estes. I have since participated in a reexamination of that evidence, concentrating principally on hairs collected from the scene of the crime.

4. Initially, out of over one hundred hairs collected from the scene of the

crime, I thoroughly examined three hairs which on balance seemed similar to hairs from Mr. Estes. There were *both similarities and dissimilarities* between the known hairs of Mr. Estes and the three hairs which I examined. One of the hairs I examined came from a washcloth, another from a bathmat, and a third from underpants belonging to the victim.

5. During the second examination I also examined two additional pubic hairs and a blond head hair found in the victim's underpants which hairs, in my opinion, were similar to the hairs of the victim. I also looked at a brown human hair found on a pillowcase, but did not examine the same as it appeared not to be a head or pubic hair which I could compare with the known hairs of Mr. Estes or the victim.

6. There were over a hundred hairs on the sheet taken from the scene of the crime. Seventy-nine of those hairs appeared to be pubic hairs. I have declined to examine the referenced hairs without a Court order directing that I do so. *It appears to me that the hairs had accumulated over a period of time, so that the association of any particular hairs to the assault in question is without value.*

7. From the evidence submitted, including those hairs not examined, *I cannot say whether or not there were hairs from the scene of the assault which may have originated from persons other than Mr. Estes and the victim.* Neither can I say with certainty that the three hairs mentioned in paragraph 4 originated from Mr. Estes or were connected with the crime (as noted in paragraph 6, there were so many hairs in the sheet that the hairs must have accumulated there over time). Another problem is that the known hair samples of Mr. Estes, as submitted to me for comparison, had been cut and were missing the roots. It is preferred that hairs submitted as known samples include their roots for purposes of accurate comparison. Accordingly, a comparison using the preferred type of hair samples could not be made between hairs from the scene of the crime and the known hairs of Mr. Estes.

Also, I was not aware of whether the washcloth, bathmat, and underpants had been laundered elsewhere (although there is an indication in the victim's testimony that she did her laundry at a "friend's" house), so that hairs similar to those of Mr. Estes *might have originated from an outside source. Other persons undoubtedly have hairs similar to those of Mr. Estes.*

During my initial examination I was also not made aware that the victim did not put on her underpants following the attack. I did not then note whether or not the pubic hair from the underpants was so deeply encrusted as to indicate the hair's presence in the underpants prior to the crime. There was a very substantial thickness of encrustation in the underpants. *In any event I now question whether the hair from the underpants, and thus possibly the hairs from the washcloth and bathmat, which hairs appeared "similar" to those of Mr. Estes, originated from the assailant.*

8. During the second examination I attempted to locate the hairs collected from the towel. I could not locate the same after reviewing the Court exhibits and contacting the Casecade [sic] Police Department. I cannot now perform any testing or comparison to ascertain whether these hairs may have originated from someone other than the victim, it having been previously established that the hairs did not originate from Mr. Estes.

9. Scientific testing of hairs involves matters within the examiner's judgment. In my judgment, for the reasons previously stated, *the hairs which I examined cannot with certainty be said to have originated from Mr. Estes. I would have fully disclosed the lack of evidentiary value of the three "similar" pubic hairs to defense counsel had he interviewed me in that respect or had*

*he asked the appropriate questions on cross-examination.* Similarly I feel that additional testing of other hairs collected at the scene of the crime would also be of no value. I have accordingly declined to perform such testing unless ordered to do so by the Court.

10. *The three "similar" pubic hairs may very well not be those of Mr. Estes or even those of the victim's assailant. To say otherwise would be conjecture.* [Emphasis added.]

In a supplemental affidavit Ms. Bradley further stated:

ANN R. BRADLEY, being first duly sworn and upon oath, deposes and says:

1. This Affidavit is supplemental to my Affidavit dated November 7th, 1984. I wish to clearly state the reasons why I have declined examination of hairs which were collected from the victim's bedsheet.

2. My reasons for declining further examination of hairs are as follows:

A. The examination would be extremely time consuming given the number of hairs collected.

B. A thorough pubic hair combing will routinely produce fewer than twelve sample hairs. The number of collected hairs from the scene of the alleged crime reflects that the hairs had accumulated over a longer time period than the one to one and one-half hours involved in the alleged attack. I am aware of no evidence that the large number of pubic hairs can be accounted for because of hairs being pulled out either by the victim or by the assailant.

C. Approximately one-half of the seventy-nine pubic hairs which I have mounted and visually examined appear much darker in color than those of the victim. The sheer number of pubic hairs, both from the victim and the depositor of the darker hairs, again reflects that many, if not all, of the hairs were deposited sometime prior to the alleged attack; once more assuming that pubic hairs were not pulled from the victim and the depositor of the darker hairs.

D. In light of the reasons previously stated, I do not believe that further examination of hairs in my possession will have any value in these proceedings. It is impossible to associate any particular hairs to the assailant, whoever that person may have been.

At trial, Ms. Bradley had testified that the state's exhibit represented "the known hairs of Kenneth Estes taken from the pubic pulled hair envelope of his sex crime kit." She testified that in conducting hair comparisons she would examine "the character of the root" and that she had done so in appellant's case. In her lab notes, she referred to pubic hairs pulled from appellant. However, appellant's known hairs had been *cut* and *not pulled.* The roots of appellant's known hairs were *not* then compared to the similar hairs found at the scene of the crime. Examination of the root is important in hair comparisons for different reasons, including a need to compare the cortical fusi as to size, shape and distribution. Defendant's trial counsel did not know whether the exemplar hairs had been pulled or cut and, hence, could not effectively cross-examine Ms. Bradley as to her testimony.

Appellant's trial counsel also failed to object to three significant statements made by the prosecution during closing argument. Clearly, there is authority for the proposition that where a prosecutor engages in misconduct and defense counsel fails to object, the error may not be raised on appeal. *State v. Sharp,* 101 Idaho 498, 503, 616 P.2d 1034, 1039 (1980); *State v. Spencer,* 74 Idaho 173, 183, 258 P.2d 1147, 1154 (1953). The only exception to this general rule is that prosecutorial error may be reviewed where the error is fundamental. *See State v. Haggard,* 94 Idaho 249, 253, 486 P.2d 260, 264 (1971). Here, defense counsel failed to object. Therefore, ordinarily we would not review the prosecutor's conduct. In the context of this analysis, however, our inquiry should be whether appellant received effective representation and part of our review should necessarily involve a discussion of whether

the appellant's trial counsel failed to object where a reasonably competent attorney would have objected and, in so failing, permitted the prosecutor to improperly persuade the jury.

It is axiomatic that in closing argument, counsel should confine themselves to matters within the record or fairly deducible therefrom. *State v. Smith,* 114 Ariz. 415, 561 P.2d 739, 743 (1977); *State v. Bradford,* 219 Kan. 336, 548 P.2d 812, 816 (1976); *State v. Rose,* 62 Wash.2d 309, 382 P.2d 513, 515 (1963).

At trial, the prosecutor stated that Ms. Somerton wiped herself off with a washcloth, which washcloth contained "pubic hair of herself *and of the defendant on that washcloth along with seminal fluid.*" This was a serious misstatement of the evidence. In fact, the evidence adduced at trial established only that a hair *"similar to"* defendant's pubic hair was found on the washcloth. If, as the prosecutor stated, the pubic hair found on the washcloth belonged to the defendant, there would seem to be no room for reasonable doubt that the defendant had been the assailant. If, on the other hand, one considers that the evidence established only that the pubic hair found on the washcloth was "similar to" defendant's pubic hair, there may well have been room for reasonable doubt.

The district court stated:

The prosecutor stated in closing that pubic hair "of the defendant" was found on a wash-cloth used by Ms. Somerton following her rape. This was a misstatement of the evidence presented at trial. Bradley's testimony was that one of two pubic hairs found on the wash-cloth was microscopically similar to Estes'[s] pubic hairs. [Citations omitted.]

While it was improper for the prosecution to make such statement, this error cannot be viewed as anything but harmless error.... On cross-examination it was clearly brought out that while Bradley could state that certain pubic hairs which she tested were similar to those of Estes, she could not positively identify any of those hairs as those of Estes or anybody else. [Citations omitted.] In light of [the] effective cross-examination of Bradley, the Court is convinced beyond a reasonable doubt that the above-said misstatement by the prosecutor did not mislead the jury and did not contribute to Estes'[s] conviction.

As explained above, the record reflects that Estes' trial counsel did not adequately prepare to cross-examine Ms. Bradley as to the hair samples and did not, in fact, adequately cross-examine her as to the probative value of the hair samples. Moreover, I cannot agree that defendant's trial counsel's cross-examination of Ms. Bradley, even had it been "effective" rendered the prosecutor's improper remark "harmless." The danger inherent in such improper prosecutorial remarks made in closing argument is well stated in *People v. Trujillo,* 624 P.2d 924 (Colo.App.1980):

Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with his office, but also because of the factfinding facilities presumably available to him. [Citation omitted.] If the state has a strong case, [prosecutorial misconduct] is not necessary, and if it has a close case, such misconduct is gross injustice to the defendant. [Citation omitted.]

Further, the prosecutor made an additional misstatement when he declared, "and the defendant even corroborates our story, he says he was there." As to this remark the district court stated:

Estes did testify that he was at the Cascade Hotel immediately prior to the rape; however, he denied raping Ms. Somerton and further denied ever being in room No. 6 of the Hotel. Thus it was abundantely [sic] clear to the jury that while Estes did admit to being "there" (i.e., at the Cascade Hotel) he did not admit to ever entering room No. 6 of the Hotel. In light of Estes'[s] testimony, the Court is convinced that the above-said state-

ment by the prosecutor did not mislead the jury in any manner.

It is true, as the district court noted, that at trial Estes testified that he had been present at the Cascade Hotel on the evening of May 17, 1979. The problem with the prosecutor's statement is not that the prosecutor said "he says he was there" but that in the same breath, the prosecutor argued to the jury that the defendant by so testifying had somehow corroborated the prosecution's theory of the case. For Estes to have corroborated the prosecution's story, he would have had to testify not only that he had been at the hotel but that he had been in the victim's room and raped her. To *that* fact the defendant did not testify. Hence, the prosecutor's implication to the contrary was improper.

Finally, in closing argument, the prosecutor vouched for the credibility of the state's witnesses. As to the witnesses from the Idaho State Laboratory, the prosecutor stated, "Take you the weight of the evidence as to lab analysts. They're very honest." A few moments later, the prosecutor stated, "Ladies and gentlemen, we have a brave young girl that came before this court and testified what happened to her. It wasn't easy on her, you could tell. Very honest as to what happened and her memory of such."

It is well-settled that such vouching is not proper argument. *See State v. Garcia,* 100 Idaho 108, 110–11, 594 P.2d 146, 148–49 (1979); *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985). As to the prosecutor's remarks that the lab analysts were "honest" and that Ms. Somerton was "honest," the district court stated:

> In the Court's view the above-said statements were merely inferences which could be reasonably be [sic] drawn from the testimony of criminalist [sic] and Ms. Somerton.... Even if those statements were improper, Estes has failed to establish resulting prejudice which would warrant post-conviction relief.

Certainly, the members of the jury, having had the opportunity to see and hear the witnesses, could draw for themselves the inference that the lab analysts and the prosecutrix were "honest." The question, however, is not whether such inference could be drawn, but whether the prosecutor, by his remarks, not only failed to ask the jury to draw that inference for themselves but instead personally vouched for their credibility.

Clearly, the prosecutor's statements referenced above went beyond proper comment. The state, however, claims that this court should not attend to the prosecutor's remarks because defendant's trial counsel failed to object. Yet, when the defendant claims that he received inadequate trial representation, the state suggests that defendant's trial counsel's failings were "harmless." Hence, the state on one hand asks us to accept the proposition that objection to prosecutorial misconduct was waived by an unalert counsel. On the other hand, the state urges that we reject defendant's claim of inadequate representation. I find it difficult to reconcile the state's urgings.

As to all of the above matters, the district court considered each issue separately and, as to each separate issue, concluded that any given error, considered alone, was "harmless." At no point, however, did the district court assess the several errors and determine whether the *cumulative effect* deprived appellant of a fair trial.

In this case, the prosecution was required to show not only penetration but the identification of the assailant. Appellant's identity as the assailant was the sole issue at trial. In light of the foregoing discussion, I must conclude that defense counsel totally failed to subject the state's scientific "corroborating" evidence to meaningful adversarial testing, further failed to adequately prepare to cross-examine the prosecutrix's testimony and, finally, failed to object to the prosecutor's remarks which warranted objection.

Under the "cumulative error" doctrine, an accumulation of irregularities each of which in itself might be harmless, may, in the aggregate, show the absence of a fair

trial. *State v. Campbell,* 104 Idaho 705, 719, 662 P.2d 1149, 1163 (Ct.App.1983). To hold error harmless, the Supreme Court must declare its belief, beyond a reasonable doubt, that there was no reasonable possibility that the errors complained of contributed to a defendant's conviction. *State v. Sharp,* 101 Idaho 498, 507, 616 P.2d 1034, 1043 (1980); *Cf.* I.C.R. 52 (1986). Although any one of the errors discussed above may, in itself, have been harmless, I cannot now say beyond a reasonable doubt that these errors, considered in the aggregate, did not contribute to the conviction.

Mr. Estes' trial counsel's preparation and performance was at least as ineffective as counsels' performances in *Carter v. State,* 108 Idaho 788, 795, 702 P.2d 826, 833 (1985) and *State v. Douglas,* 97 Idaho 878, 555 P.2d 1145 (1976) wherein we reversed judgments of conviction on the grounds of ineffective assistance of counsel. There can be little doubt that counsel's many failures, prejudiced appellant's defense. The dual tests of *Strickland* have therefore been met. Ordinarily, I would reverse the judgment of conviction and remand for a new trial. However, for reasons explained below, I would decline to order a retrial.

I now turn to appellant's claim that he was denied the right to a speedy trial. In *State v. Lindsay,* 96 Idaho 474, 475, 531 P.2d 236, 237 (1975), we observed:

> The right of speedy trial as guaranteed by a state constitution or statute cannot be said to be necessarily identical to that right to speedy trial guaranteed in the Constitution of the United States. We find, however, that the "balancing test" laid down in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is consistent with decisions of this court stating that whether one has been deprived of his right to a speedy trial must be decided by reference to considerations in addition to the mere passage of time. [Citations omitted.]

As we explained in *State v. Talmage,* 104 Idaho 249, 251, 658 P.2d 920, 922 (1983), "The 'balancing test' enunciated by the United State Supreme Court in *Barker v.*

*Wingo* ... is a four-fold balancing test determinative of whether an accused has been denied a speedy trial. The factors to be considered are: (1) the length of delay; (2) the reason(s) for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant occasioned by the delay." [Citations omitted.]

The time for computing delay, for purposes of determining whether an accused was denied the right to a speedy trial, begins on the date the criminal complaint against the accused was issued. *Lindsay,* 96 Idaho at 476, 531 P.2d at 238. In the present case, the appellant avers and the state concedes that the time lapse between the filing of the criminal complaint and the time the jury was summoned for the second trial was three years and eight months. It is true that delays in bringing a defendant to trial caused or consented to by the defendant are considered to constitute a waiver of the right to be tried within the time affixed by statute or required by article 6 of the U.S. Constitution. *Talmage,* 104 Idaho at 253, 658 P.2d at 924. In this case, appellant had stipulated to continue a trial date from September 19, 1979 to November 29, 1979. The stipulation to this continuance, however, cannot reasonably be viewed as a total waiver of the right to speedy trial. It is clear that the time allowed for the continuance comprised only a very small portion of the total time for the delay. The delay in the present case is clearly sufficient to trigger a judicial inquiry into whether appellant had been denied a speedy trial. *Talmage,* 104 Idaho at 252, 658 P.2d at 923; *Lindsay,* 96 Idaho at 476; 531 P.2d at 238.

The state contends that the main reason for the delay was trial counsel's failure to diligently prosecute the appeal raising the issue of the missing transcript. In its responsive brief, the state argues:

> [A]fter conviction and filing of notice of appeal on 17 January, 1980, from what is extant in the record, it appears that defendant did not urge the appeal forward. *The case simply sat for want of action. It cannot be claimed on the basis of this*

*record that defendant assiduously prosecuted his appeal.* [Emphasis added.]

In the ordinary case, when a criminal defendant makes a case that he was denied the right to a speedy trial, it will be the prosecution and not his own attorney who must furnish reasons justifying any proven delay. In the present case, it appears that trial counsel's failure to diligently prosecute the appeal not only furnished the main reason for the delay; but trial counsel further failed to assert appellant's right to a speedy trial, which assertion is one factor to be considered in the balancing test set forth above. That counsel allowed the appeal to languish and failed to assert appellant's right to a speedy trial are further examples of his ineffectiveness.

Whether the delay is occasioned by the state or by a criminal defendant's own counsel, a criminal defendant is nonetheless entitled to a speedy trial. Applying the facts in this record to the four factors enumerated above, I reach the following conclusions: (1) the length of the delay, even subtracting the time allowed for the continuance to which defendant stipulated, was considerable; (2) the reason or reasons for the delay are not altogether clear, but to the extent the delay was caused by counsel's failure to diligently prosecute the first appeal, the delay was inexcusable; (3) the appellant's counsel failed completely to assert appellant's right to a speedy trial; and (4) it is likely that appellant was prejudiced by the delay. The balance struck in this case is close. Following his initial conviction in 1979, Mr. Estes was sentenced to serve an indeterminate period of time not to exceed ten (10) years. Following his conviction in 1983, Mr. Estes was sentenced to serve an indeterminate term of seven (7) years with sixty-three (63) days of credit for pre-judgment incarceration. The record does not reflect that at any time since his second conviction, Mr. Estes has been on bail pending appeal. Hence, he has already been imprisoned over three years. Mr. Estes was unable to challenge his first conviction because the transcript of that trial was unavailable. In his second trial, Mr. Estes was not only not brought to trial in a timely fashion but was denied the effective assistance of counsel. It would offend my sense of justice to require the appellant to stand trial a third time. In light of all of the foregoing considerations, I would reverse the judgment of conviction and remand the cause to the district court with instructions that it enter an order directing the warden of the State Penitentiary to release and discharge Mr. Estes.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting from denial of Petition for Rehearing.

Three members of this Court today close the state avenues of appeal from Mr. Estes by refusing to rehear appeals of both his conviction for rape and his petition for post-conviction relief and denial of a motion for a new trial. The majority takes this action despite the fact that Estes' counsel has directed the Court's attention to the recent case of *Kimmelman v. Morrison,* — U.S. ——, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The *Kimmelman* case was neither briefed nor argued when these appeals were first heard.

In *Kimmelman,* the United States Supreme Court was confronted, as we are here, with a claim of ineffective assistance of counsel in a rape trial. There defense counsel conducted no pretrial discovery which led to the "surprise" introduction of an illegally seized bedsheet that contained incriminating evidence. Here Estes' counsel at his trial conducted little or no discovery, did not investigate the sexual background of the prosecutrix in preparation for cross-examination, and did not prepare to counter the introduction of incriminating scientific evidence of the state. In affidavits submitted in support of Estes' motion for a new trial, two of the state's scientific experts explained that the results were inconclusive at best and possibly exculpatory. Yet, due to ineffective cross-examination, the weakness of this evidence was never adequately presented to the jury.

In *Kimmelman,* the Court agreed with the lower court that the first requirement of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1976), incompetence of counsel, was met and remanded for a determination of the other *Strickland* requirement that the defendant had been prejudiced by his attorney's incompetence. Yet this Court, when presented with defense counsel sins much more egregious than those established in *Kimmelman* refuses to reconsider Estes' appeal in light of the recent guidance provided by our brethren in Washington, D.C.

Once again this Court avoids facing up to its own responsibilities in favor of letting "George" do it.