23 P.3d 775

Darin Jay MILBURN, Petitioner–
Appellant,

v.

STATE of Idaho, Respondent.

No. 24923.

Court of Appeals of Idaho.

Sept. 27, 2000.

Rehearing Denied April 12, 2001.

Petition for Review Denied May 29, 2001.

Kirk J. Anderson, Boise, for appellant.

Alan G. Lance, Attorney General; Kenneth M. Robins, Deputy Attorney General, Boise, for respondent. Kenneth M. Robins argued.

LANSING, J.

This is an appeal from the district court's judgment denying Darin Milburn's application for post-conviction relief. Milburn's action was based upon alleged ineffective assistance of counsel in a criminal action that resulted in Milburn's conviction for second degree murder. Following an evidentiary hearing, the district court found that Milburn had not proven that the legal service provided by his defense attorneys fell below an objective standard of reasonableness, and on that basis the district court rendered judgment against Milburn. For reasons discussed below, we affirm.

## FACTS AND PROCEDURAL HISTORY

Milburn was convicted of second degree murder in 1993 following a jury trial. The background of the case was outlined by this Court in an earlier appeal in this post-conviction action, *Milburn v. State*, 130 Idaho 649, 946 P.2d 71 (Ct.App.1997) (*Milburn I* ):

> The investigation that ultimately led to Milburn's conviction began on April 11, 1992, when a body was discovered in a recently burned irrigation ditch near the town of Middleton. The body, which was later identified as that of twenty-two-year-

old Carey Lynn Shaddy, was charred and had three gunshot wounds. Police estimated that the murder occurred sometime prior to April 2, 1992. This determination was based in part on evidence suggesting that the body was in the irrigation ditch when the ditch was burned. The farmer who had burned the weeds in the ditch said the fire was set on April 2, which was confirmed by rental records showing that on that date the farmer had returned rented equipment used to clear the ditch. The date of death was also substantiated by the report of an entomologist who rendered an opinion, based on the growth of fly larvae found on the corpse, that the death had occurred on or before April 2.

> The Canyon County Sheriff's Department conducted an extensive investigation involving more than one hundred interviews. Ultimately, Darin Milburn was arrested for the killing and was charged with first degree murder, I.C. §§ 18–4001, –4003(a).

> . . . .

> In January 1993, a jury trial was conducted. The prosecutor's case against Milburn was built on three components: (1) evidence that Milburn was the last person to be seen with Shaddy prior to the asserted date of Shaddy's death; (2) ballistics tests that identified Milburn's .44 caliber hand gun as the murder weapon; and (3) testimony that Milburn had told an acquaintance, Christopher Pickering, that he had killed someone in Middleton. Milburn's attorneys did not present any evidence following the State's case-in-chief, but tendered a defense through cross-examination of the State's witnesses.

> . . . .

> To show that Milburn was the last person to see Carey Shaddy alive, the prosecution offered the testimony of a bartender who worked at the Chaparral Bar in Middleton. She testified that Milburn and Shaddy left the bar together at about 11:30 p.m. on March 31, 1992, after Milburn had offered to give Shaddy a ride home. The bartender also testified that she watched the two men get into Milburn's vehicle

before she finally looked away. It was the State's theory that Milburn killed Shaddy shortly after leaving the bar.

Milburn, however, always maintained that he refused to give Shaddy a ride that night. The jury heard Milburn's account through an officer who testified about Milburn's statements to the police. Milburn contended that once the two men left the bar, Shaddy told Milburn that he wanted a ride to Caldwell, a town several miles away. Milburn said that he was not willing to drive Shaddy that far because he was afraid of getting stopped for driving under the influence of alcohol. Milburn told police that he left Shaddy in the parking lot, and that the last time Milburn saw him, Shaddy was walking down the street away from the bar.

*Id.* at 653, 946 P.2d at 75. The jury returned a verdict finding Milburn guilty of second degree murder, Idaho Code §§ 18–4001, – 4003(g).

After receiving this verdict, Milburn obtained a different attorney. Through his new counsel, Milburn presented a motion for a new trial in the criminal case premised on a contention that his trial attorneys had provided ineffective assistance of counsel. After conducting an evidentiary hearing at which Milburn's two trial attorneys testified, the district court denied the motion for a new trial, concluding that Milburn had not shown ineffective assistance of counsel. Milburn thereafter filed an application for post-conviction relief, again alleging that his attorneys in the criminal case provided ineffective assistance by failing to conduct an adequate investigation and failing to make use of available exculpatory evidence.[1] The State moved for summary dismissal of the post-conviction application pursuant to I.C. § 19–4906(c). In response to that motion, Milburn relied upon the transcript of the evidentiary hearing that had been conducted on the motion for a new trial. The district court granted the State's motion and summarily dismissed the post-conviction action. The appeal from that summary dismissal gave

rise to *Milburn I*, in which we held that Milburn's evidence was sufficient to raise genuine factual issues regarding the adequacy of his defense attorneys' performance which precluded summary dismissal. We therefore reversed the order of summary dismissal with respect to the ineffective assistance claims and remanded the case to the district court for an evidentiary hearing.

A three-day evidentiary hearing was conducted on remand in which testimony was taken from ten witnesses, including Milburn's two trial attorneys and David Johnson, an investigator who worked for the trial attorneys in preparing Milburn's defense. Evidence presented at the hearing also included transcripts of numerous witness interviews conducted by law enforcement officials during the investigation of Shaddy's murder and investigator Johnson's notes from his witness interviews. At the conclusion of the hearing, the district court again denied Milburn's claims, holding that Milburn's defense attorneys were not deficient in their performance.

Milburn again appeals, contending that the district court erred in refusing to exclude witnesses for the State who were not timely disclosed in compliance with a pretrial order and that the district court erred in its finding that Milburn's attorneys provided effective assistance of counsel in the criminal case. Specifically, Milburn argues that he met his burden to prove that his attorneys were deficient because they did not present available exculpatory evidence and did not adequately impeach a prosecution witness with his prior inconsistent statements.

## ANALYSIS

### A. Late Disclosure of the State's Witnesses

■ Following remand from *Milburn I*, the district court conducted a pretrial conference. At that conference, the court set the matter for evidentiary hearing and ordered the parties to disclose their witnesses and exhibits by·a specified date. Milburn served a timely disclosure statement, but the State did not. Milburn therefore filed a motion to

---

**1.** In *Milburn I*, we held that Milburn's unsuccessful presentation of a claim of ineffective assistance of counsel in his motion for a new trial did

not procedurally bar him from raising the same claim in his post-conviction action. *Milburn I*, 130 Idaho at 651–52, 946 P.2d at 73–74.

exclude the State's evidence for noncompliance with the court's order. The State ultimately served its disclosure statement nine days before the evidentiary hearing and produced an affidavit of another witness the day before the hearing. The district court excluded the affidavit presented by the State the day before trial as a sanction for the State's tardiness, but denied Milburn's motion to exclude the remainder of the State's witnesses and evidence. The court concluded that Milburn had not shown that he was unaware of the prospective testimony of the State's witnesses or was prejudiced by the late disclosure. On appeal, Milburn asserts that the district court erred in not sanctioning the State by precluding the State from presenting witnesses at the evidentiary hearing.

▮ Proceedings brought under the Uniform Post–Conviction Act, I.C. § 19–4901, *et seq.*, are civil actions and are governed, for the most part, by the Idaho Rules of Civil Procedure. I.C.R. 57(b); *Pizzuto v. State*, 127 Idaho 469, 470, 903 P.2d 58, 59 (1995); *Clark v. State*, 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Therefore, in examining Milburn's claim of error we look to I.R.C.P. 16(i), which provides that if a party disobeys a scheduling order or pretrial order, the court "may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)." The referenced subsections of Rule 37(b) authorize the court to impose sanctions for discovery violations. The permissible sanctions include refusing to allow the disobedient party to support or oppose particular claims and prohibiting the party from introducing designated evidence. I.R.C.P. 37(b)(2)(B). The grant or denial of sanctions for discovery violations is committed to the discretion of the trial court and will be disturbed on appeal only for a manifest abuse of that discretion. *Southern Idaho Production Credit Ass'n v. Astorquia*, 113 Idaho 526, 528, 746 P.2d 985, 987 (1987); *Fish Haven Resort, Inc. v. Arnold*, 121 Idaho 118, 121, 822 P.2d 1015, 1018 (Ct.App.1991).

The sanction sought by Milburn, the exclusion of all of the State's evidence, would have been nearly equivalent to an order for judgment against the State. In *Roe v. Doe*, 129 Idaho 663, 931 P.2d 657 (Ct.App.1996), we considered a similar sanction, an order excluding one party's witnesses due to untimely responses to interrogatories. We there stated:

> [S]ome balancing of the equities and some consideration of the efficacy of lesser sanctions must precede a trial court's imposition of a sanction which will significantly impair a party's ability to present its case on the merits at trial. Borrowing from Justice Donaldson's concurrence in *Astorquia*, we hold that a trial court, "must balance the equities by comparing the culpability of the disobedient party with the resulting prejudice to the innocent party." *Astorquia*, 113 Idaho at 532, 746 P.2d at 990. Second, a trial court should not impose a sanction that will prevent full adjudication of a case on the merits without having first considered lesser sanctions and having reached a conclusion, supported by the record, that lesser sanctions would be ineffective or inadequate.

*Roe v. Doe*, 129 Idaho at 668, 931 P.2d at 662. In Milburn's case, the district court conducted the required balancing of the equities. Although the State was culpable and offered no excuse for the late disclosure, the district court also found that Milburn was not prejudiced by the delay. Additionally, the court indicated that the hearing could be postponed, should Milburn request it, as a consequence of the State's late disclosure.

The record supports the district court's determination that the State's tardy disclosure did not prejudice Milburn. Since the only claim to be tried at the evidentiary hearing was one of ineffective assistance of counsel, Milburn and his post-conviction counsel certainly could anticipate that his defense attorneys from the criminal case would be among the State's witnesses. Moreover, because essentially the same claim had been presented five years earlier in Milburn's motion for a new trial, and the defense attorneys had testified at the hearing on that motion, Milburn was generally aware of the nature of the testimony that would be given. Although the evidence at the earlier hearing may not have indicated that the defense at-

torneys had employed an investigator who examined evidence and conducted witness interviews in Milburn's criminal case, Milburn himself was aware of the investigator's involvement from having met with him during the course of the criminal proceedings. The district court offered Milburn the option of postponing the hearing if he deemed it necessary in order to prepare to meet the State's late-disclosed evidence. In the circumstances presented here, we conclude that the district court did not abuse its discretion in refusing to sanction the State's violation of the pretrial order by excluding all of the State's evidence.

## B. Ineffective Assistance of Counsel

After remand from the *Milburn I* appeal, Milburn's post-conviction action was based solely on a claim that he received ineffective assistance of counsel in the defense of the criminal charge. Milburn bore the burden of proving this ground for relief by a preponderance of the evidence. Idaho Criminal Rule 57(c); *Sosa v. State,* 127 Idaho 766, 768, 906 P.2d 136, 138 (Ct.App.1995); *Odom v. State,* 121 Idaho 625, 626, 826 P.2d 1337, 1338 (Ct.App.1992). To prevail on a claim for ineffective assistance, an applicant must show that the defense attorney's representation was deficient and that the deficiency was prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *State v. Roles,* 122 Idaho 138, 144, 832 P.2d 311, 317 (Ct.App.1992). In order to meet the deficient performance prong of this test, an applicant must demonstrate that the attorney's conduct fell below an objective standard of reasonableness. *Strickland,* at 687–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Aragon v. State,* 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988). A demonstration of deficient performance requires that the applicant's evidence overcome a strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance. *Id.; State v. Leavitt,* 116 Idaho 285, 291, 775 P.2d 599, 605 (1989); *Estes v. State,* 111 Idaho 430, 433–34, 725 P.2d 135, 138–39 (1986). In evaluating an attorney's performance a court must endeavor "to eliminate the distorting effects of hindsight, to recon-

struct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

To satisfy the prejudice prong of the *Strickland* test, the applicant must establish that there is a reasonable probability that, absent counsel's unprofessional errors, the outcome of the trial would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2067, 80 L.Ed.2d at 697; *Aragon,* 114 Idaho at 761, 760 P.2d at 1177. That is, the applicant must show that the attorney's deficient conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063, 80 L.Ed.2d at 692–93; *Ivey v. State,* 123 Idaho 77, 80, 844 P.2d 706, 709 (1992). It is not enough for an applicant to show that his counsel's performance *might* have been better and *might* have contributed to the conviction. Rather, the applicant must show actual unreasonable performance by trial counsel and actual prejudice. *Estes,* 111 Idaho at 434, 725 P.2d at 139.

A trial court's determination that a party has not met its burden of proof in a post-conviction action is entitled to great weight. *Garzee v. State,* 126 Idaho 396, 398, 883 P.2d 1088, 1090 (Ct.App.1994); *Sanders v. State,* 117 Idaho 939, 940, 792 P.2d 964, 965 (Ct.App.1990); *Larkin v. State,* 115 Idaho 72, 74, 764 P.2d 439, 441 (Ct.App.1988). Even if the evidence is controverted, a trial court's finding of fact will not be disturbed on appeal if it is supported by substantial evidence in the record. *Martinez v. State,* 125 Idaho 844, 846, 875 P.2d 941, 943 (Ct.App.1994); *Holmes v. State,* 104 Idaho 312, 313, 658 P.2d 983, 984 (Ct.App.1983). However, this Court freely reviews the legal conclusions drawn by the trial court from those facts. *Gabourie v. State,* 125 Idaho 254, 256, 869 P.2d 571, 573 (Ct.App.1994); *Young v. State,* 115 Idaho 52, 54, 764 P.2d 129, 131 (Ct.App.1988).

Here, Milburn asserts that he met his burden to prove that his defense attorneys provided ineffective assistance in three ways: (1) by failing to present evidence that Wes

Huskey, a suspect who was investigated by the police before Milburn was charged, was the likely perpetrator of Carey Shaddy's murder; (2) by failing to adequately impeach a prosecution witness, Christopher Pickering, with his prior inconsistent statements; and (3) by failing to call witnesses who would testify that they saw Carey Shaddy alive and well several days after he was last seen in the company of Milburn and after the date of death that was hypothesized by the State.

## 1. Evidence of Wes Huskey's Statements

We begin with Milburn's assertion that his defense attorneys were deficient because they did not present to the jury an alternative theory and supporting evidence implicating Wes Huskey in Shaddy's murder. In *Milburn I,* we described the facts surrounding the Huskey admissions, as then reflected in the record:

Two days before the newspapers began reporting on the discovery of Shaddy's body, an employee of a bar in Middleton told police that a man named Wes Huskey admitted to committing a murder. She reported that Huskey entered the bar on the 8th or 9th of April and told people in the bar that he had shot a twenty-two-year-old man. The witness said that she could see blood on Huskey. A patron of the bar also told police that Huskey came into the bar looking "really nervous," that he had blood on his cheek, and that he admitted to shooting somebody. According to this witness, Huskey said he was afraid that he had killed the wrong person. A third person who was also in the bar confirmed that Huskey said "I just shot somebody . . . I don't know but I think it was the wrong guy." When the police asked this witness if she believed Huskey's story, she said "Oh, yeah. He was as white as a ghost."

Later, when police interviewed Husky he denied killing anyone. However, he admitted that someone had offered to pay

him $5,000 to kill a man, D.E. Huskey's ex-wife also told police that Huskey had made comments to several people that he was going to kill D.E. and D.E.'s father. The record also indicates that a man identifying himself as Wes Huskey on two occasions called the Port of Hope, a substance abuse treatment facility, and said he had killed "the wrong man."

*Id.* at 656, 946 P.2d at 78.

In *Milburn I,* we held that Milburn's claim that his defense attorneys were deficient for failing to use the evidence of Huskey's admissions could not be summarily dismissed on the basis that the attorneys' decision was one of trial strategy because on the then-existing record, it appeared that the decision had been made in ignorance of much of the available evidence. There was no indication that anyone acting for the defense had interviewed Huskey or any of the witnesses who reported Huskey's admissions to the police. No contention had been presented by the State or by the defense attorneys that Huskey's statements would have been inadmissible in Milburn's trial.

At the evidentiary hearing following remand from *Milburn I,* it was demonstrated for the first time that investigator Johnson was well aware of the Wes Huskey story and had interviewed several witnesses about it. Johnson had concluded that little credibility could be attached to Huskey's statements—made to various witnesses—that he had killed someone.[2] At the evidentiary hearing, the defense attorneys also, for the first time, questioned whether Huskey's out-of-court statements would have been admissible if they had been offered in evidence at Milburn's criminal trial.

The district court concluded that Milburn's defense counsel could not be faulted for failing to present a defense theory that Huskey may have been the murderer because the testimony of witnesses who heard Huskey's assertions would have been inadmissible as hearsay. The district court held:

**2.** This credibility assessment was supported by one of the women to whom Huskey had made the admissions in the bar. She testified at the evidentiary hearing that she took Huskey's statements "with a grain of salt" because he was

always coming into the bar with stories of "cutting somebody open or fighting somebody or shooting somebody. You know, every time he came in, he had a different story to tell you."

Clearly, Huskey's statement to [the bar employee] is hearsay and would have to come in under the statement against interest exception under Rule 804(b)(3). However, this exception requires that the declarant be unavailable and there has been nothing presented in the record to show that Huskey was an unavailable witness.

■ We agree with the district court's assessment. There was no evidence that the defense attorneys would have been able to obtain testimony from Wes Huskey himself that he had killed Carey Shaddy; in police interviews Huskey had denied involvement in the crime. Thus, the only way this alternative theory could have been presented at Milburn's criminal trial was through the testimony of the witnesses in the bar who heard Huskey's admissions. Such testimony would have been hearsay. I.R.E. 801. The only hearsay exception advanced by Milburn as a means for gaining admission of this testimony is the exception for statements against interest, I.R.E. 804(b)(3).[3] This hearsay exception applies only if the declarant is unavailable as a witness. I.R.E. 804(b). Although Huskey's admissions to having killed someone qualify as statements against interest in that they "tended to subject declarant to civil or criminal liability," I.R.E. 804(b)(3), Milburn has not shown that Huskey was unavailable as a witness and therefore has not demonstrated that his defense attorneys could have presented this hearsay evidence at trial.

Milburn argues that Huskey was shown to be "unavailable" pursuant to I.R.E. 804(a)(3), which specifies that witness unavailability includes situations in which the declarant "testifies to a lack of memory of the subject matter of declarant's statement." Milburn points to Huskey's statements in a police interview indicating that he experienced alcoholic blackouts and that he did not remember what he had said at the bar because he had been on a drinking binge that night. Based on these comments in a transcribed police interview, Milburn asserts that Huskey was proven to be "unavailable" as the term is defined by I.R.E. 804(a)(3).

We disagree for several reasons. First, Rule 804(a)(3) specifically requires that the declarant *testify* to his lack of memory. Huskey's statements about lack of memory, upon which Milburn relies, were made during an informal police interview. These statements do not qualify as testimony. Huskey was not placed under oath prior to the police questioning; he was not subject to cross-examination nor the penalty of perjury. Therefore, Huskey's statements to the police do not qualify as testimony that he lacks a memory of the statements made in the bar.

Second, it is not a lack of memory of having made the out-of-court statements that is pertinent under I.R.E. 804(a)(3), but rather lack of memory of the "subject matter" of the out-of-court statements. Huskey never stated to police that he could not recall whether he killed someone. During police interviews he consistently denied having shot Carey Shaddy or anyone else.[4] Thus, the police interview transcripts do not show that Huskey lacked memory of the "subject matter" of his declarations to people in the bar.

Huskey could also have been deemed unavailable under I.R.E. 804(a)(1) or (2) if he had been subpoenaed to testify but refused to do so or invoked the constitutional privilege against self-incrimination. However, because he was never called upon to give

---

**3.** Idaho Rule of Evidence 804(b) provides in part:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid a claim by declarant against another, that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

**4.** Huskey admitted to officers that, although he could not remember making the statements, he might have told people at the bar that he had killed someone. He explained, "When I get drunk like that, I am the biggest liar in the world anyway."

testimony, he cannot be deemed unavailable under either of these components of the Rule 804(a) definition of "unavailability."

Milburn has not met his burden to show that Huskey was unavailable as a witness[5] and that his defense attorneys consequently would have been able to introduce hearsay evidence of Huskey's out-of-court statements under I.R.E. 804(b). Accordingly, the district court's holding that Milburn's defense attorneys were not deficient for failing to present this evidence is affirmed.

### 2. Impeachment of Christopher Pickering

█ Milburn next asserts that his trial counsel provided ineffective assistance by failing to impeach one of the State's witnesses, Christopher Pickering, with his prior inconsistent statements. The pertinent facts were discussed in *Milburn I* as follows:

> Pickering stated that on the afternoon of April 7, 1992, while he and Milburn were walking down a road, Milburn commented that he had would like to move to Alaska because he had killed someone in Middleton. Pickering also told police that at the time the statement was made, he thought Milburn was joking, and that it was only after Shaddy's body was discovered and the newspapers began reporting on the crime that he took the statement seriously. On further questioning during his first police interview, Pickering said that he knew nothing else about the murder but that his wife, Dawn Hogan, could tell the police more because she and Milburn had had a long talk about the murder.

> When police interviewed Dawn Hogan, however, she denied ever having such a conversation with Milburn. Even under intense pressure from the police, which involved direct threats of prosecution as an accomplice if she would not cooperate, seventeen-year-old Hogan maintained that she never had a conversation with Milburn regarding the murder. She indicated that

> she had not even heard about Milburn's possible involvement in the murder until the night before the interview when Pickering himself told her that Milburn had committed the crime. She also indicated that she and Pickering were not married, contrary to what Pickering had told police, and that they did not, as he maintained, have a child together.

> When Pickering was called as a witness at the preliminary hearing, his story changed. At that hearing Pickering repeatedly denied ever hearing Milburn make a statement about a murder in Middleton. Then, a few days after the preliminary hearing, Pickering reportedly told yet another version of the events related to the murder. Two friends of Pickering, Anora Baxter and Vicky Boyd, told police that Pickering had given them detailed information about how the murder had occurred while Shaddy, Milburn, and another man were gopher hunting, that the gun held by the police was not the actual murder weapon, and that the true murder weapon had been in Pickering's car before the murder. When Pickering was confronted by police about his statements to Baxter and Boyd, he denied making them. Pickering claimed that anything he did tell the women about the murder he heard from Hogan.

> [Defense] attorney Wiebe's cross-examination of Pickering at trial consisted of a question as to why Pickering told the police he was married to Hogan and very brief questioning about Pickering's failure to implicate Milburn at the preliminary hearing. Wiebe did not interrogate Pickering about any of the other inconsistencies in his various statements, and the defense attorneys did not call any witnesses to impeach Pickering.

*Milburn I*, 130 Idaho at 654–55, 946 P.2d at 76–77.

In *Milburn I*, the only testimony regarding the defense team's strategy for cross-examining Pickering came from one of the

---

**5.** Because of this conclusion, we need not consider whether Huskey's out of court statements would also have been inadmissible under the provision of I.R.E. 804(b)(3) that a statement which tends to expose the declarant to criminal liability and which is offered to exculpate an accused "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

defense attorneys who admitted that he had not read the statements given to the police by Boyd and Baxter and who gave no reason for failing to impeach Pickering with many of his prior inconsistent statements. We therefore held that Milburn had raised a factual issue which could not be disposed of on summary disposition as to whether his attorneys were deficient in failing to consider or employ available evidence to impeach Pickering's testimony. *Milburn I*, 130 Idaho at 656, 946 P.2d at 78.

At the evidentiary hearing following *Milburn I*, however, both defense attorneys and investigator Johnson testified about this issue. Investigator Johnson testified that he interviewed Boyd and Baxter and discovered information that he believed enhanced Pickering's credibility rather than impeached it. One of the defense attorneys testified that he had carefully considered the extent to which the defense could safely impeach Pickering with his prior inconsistent statements without opening the door for the State to rehabilitate Pickering by introducing his prior *consistent* statements. The attorney deemed it essential to keep out of evidence Pickering's story to Boyd and Baxter that Shaddy was shot while he was gopher hunting with Milburn because the story included an assertion that although the first shot was accidental, two more shots were intentional. In the attorney's view, this would have provided *mens rea* evidence that could have aided the prosecution. The attorney testified that he had conducted extensive legal research and had written a brief on the question whether the defense's impeachment of Pickering with his prior inconsistent statements would allow the State to rehabilitate him with the use of other prior statements, including the gopher hunting story, under I.R.E. 801(d)(1).[6]

The district court accepted this explanation from the defense attorneys as a legitimate trial strategy. The court explained:

Vicki Boyd was interviewed by [the defense investigator] and related that Pickering told her that Shaddy had been shot while gopher hunting—That the first shot was accidental, and the following two shots were presumably intentional.

. . . .

It appears to this Court that the defense team had interviewed all of the witnesses and concluded that questioning Pickering and others about Pickering's prior statements would be messing with dynamite. At best, it would introduce several versions of the killing which all implicated Milburn as a principle; at worst, it turns a second degree murder case into a first degree murder case.

■ The district court's decision is supported by the record. The evidence shows that the attorneys' decision not to further impeach Pickering was a rational trial strategy formed with knowledge of the evidence. A court may not second guess, on a claim of ineffective assistance of counsel, informed strategic and tactical decisions made by trial counsel. *State v. Larkin*, 102 Idaho 231, 233, 628 P.2d 1065, 1067 (1981); *Davis v. State*, 116 Idaho 401, 406, 775 P.2d 1243, 1248 (Ct. App.1989). We therefore affirm the trial court's determination that Milburn failed to show deficient performance by his attorneys in their handling of Pickering's cross-examination.

### 3. Evidence of "post-mortem" sightings

■ Lastly, Milburn asserts that his trial counsel was ineffective in failing to present evidence of multiple sightings of Shaddy after the April 1 or 2, 1992 time of death posited by the State. This evidence allegedly would have undermined the State's assertion that Milburn was the last person known to have been with Shaddy, which was based on testimony that Milburn agreed to give Shaddy a ride home from a bar hours before the alleged time of death. Milburn contends that several witnesses would have testified to seeing Shaddy alive after April 2. However, evidence presented at the evidentiary hearing supports the district court's holding that defense counsel's failure to elicit testimony from these witnesses at the criminal trial was a reasonable strategic decision.

---

**6.** Rule 801(d)(1) provides that a statement is not hearsay if it is "consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive."

Milburn presented a witness who testified that he overheard a man named. Tim Dubose say that he, Dubose, had given Shaddy a ride home the same night that Shaddy left the bar with Milburn. However, the State countered with evidence that Dubose was interviewed by investigator Johnson. Dubose told Johnson that he had given Shaddy a ride home one night, but did not recall the date. Dubose also said that this contact with Shaddy occurred at 6:00 p.m., not as late as 11:30 p.m., which was the approximate time at which Milburn and Shaddy left a bar together on the night of March 31, 1992. The district court concluded that because Dubose's contact with Shaddy may have been prior to March 31, it was not helpful to the defense, and that trial counsel's failure to use Dubose's testimony was a reasonable tactical decision. We agree. The evidence demonstrates that Milburn's defense team followed up on the hearsay information that Tim Dubose had been with Shaddy on the night of March 31 but found no useful evidence. Milburn has not demonstrated that his defense attorneys could have offered exculpatory evidence through Dubose.

Similar infirmities plague the potential testimony of two other witnesses. Both of these individuals indicated in statements to police that they had seen Shaddy at a gas station in Middleton after April 1. However, on being interviewed by investigator Johnson, they were less positive about the dates of their sightings. Neither witness could corroborate the dates. One witness indicated that she saw Shaddy two or three days after April 1, but could not pinpoint a specific date or time. The other witness told investigator Johnson that he saw Shaddy on either March 27 or April 8, 1992, and he believed that he had a gasoline receipt in a specific amount to verify the date. However, the gasoline receipt was never produced by the witness and, upon Johnson's examination of the gas station's cash register records, there was no record of a sale on April 8 in the dollar amount mentioned by the witness. Therefore, it was concluded by deduction that the witness had purchased the gasoline and seen Shaddy on March 27, which would not have assisted Milburn's defense. Had Milburn's trial attorneys called these two witnesses to testify

as to their "post-mortem" sighting at the criminal trial, their testimony would have had little probative value in view of their uncertainty as to the dates of the sightings.

 Milburn argues that there could not have been an informed strategic decision by his attorneys to forego the use of these witnesses because the details of investigator Johnson's findings from his interviews of the witnesses and follow-up investigation may not have been relayed to the attorneys. Milburn's argument assumes that the Sixth Amendment standard for effective assistance of counsel does not permit an attorney to delegate to a non-attorney the responsibility to assess the usefulness of potential witnesses. We need not address the validity of this assumption because, even if the omission to use these witnesses was not an informed, tactical decision made personally by the attorneys, the omission could not have been prejudicial to Milburn in light of the marginal probative value of the prospective testimony.

 The final sighting was by a couple who, coincidentally, claimed to have seen Shaddy at the same Middleton gas station. The couple said they saw him as they were en route to a concert in Boise. The date of the concert was confirmed to be April 3, and thus the couple's testimony would have been in conflict with the State's theory of an April 1 or 2 date of death. According to the woman, on April 3 at approximately 7:30 p.m., as she and her date drove through Middleton, they saw Shaddy washing a truck at the gas station. Milburn's defense attorneys explained that they made a tactical decision not to use the testimony of these witnesses at Milburn's trial. The attorneys believed that the date of Shaddy's death was so firmly established that it could not be credibly challenged, and that to offer evidence of an "impossible" sighting of Shaddy on April 3 would damage the defense in the eyes of the jury. The district court concluded that, although these were the strongest witnesses, their testimony was reasonably rejected in the face of compelling evidence of an April 1 or 2 date of death.

The district court's ruling is supported by the record. The State's evidence establish-

ing Shaddy's date of death to be on or before April 2 included, *inter alia*, the expert opinion of an entomologist and the farmer's testimony that he burned the ditch on April 2, which was corroborated by a rental return receipt for the ditch burner. Moreover, the couple's sighting of the person they identified as Shaddy was from the vantage point of a car traveling by on the street while the person was washing a truck. Because of the brevity of the witnesses' opportunity to view the individual and their distance from him, the reliability of their identification of the individual as Shaddy could have been readily challenged on cross-examination. We conclude that counsel's determination to forego use of this testimony in order not to lose credibility with the jury was, as the district court held, a reasonable tactical decision.

## CONCLUSION

The district court did not abuse its discretion in denying Milburn's motion to exclude the State's witnesses as a sanction for tardy disclosure. The district court's determination that Milburn received effective assistance of counsel is supported by substantial and competent evidence in the record. Accordingly, the judgment of the district court denying Milburn's request for post-conviction relief is affirmed.

Judge SCHWARTZMAN and Judge Pro Tem HORTON, CONCUR.