(684 P.2d 445)

No. 55,039

In the Interest of LAKESHA RUSHING

Opinion filed June 21, 1984.

*Mark T. Jeffers,* of Kansas City, for appellant father Aaron Rushing.

*Kevin B. Johnson,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Robert T. Stephan,* attorney general, for appellee State of Kansas.

Before REES, P.J., ABBOTT and PARKS, JJ.

REES, J.: Aaron Rushing appeals from the severance of his parental rights in and to his daughter, Lakesha. Our factual review is necessarily restricted to and by the matters shown by the record before us.

A petition alleging Lakesha to be a deprived child was filed on February 29 [*sic*], 1981. Having been born July 30, 1979, Lakesha then was nineteen months of age. A lawyer was appointed to act as attorney for Aaron. An evidentiary hearing was held on June 2, 1981. Lakesha's guardian ad litem, both parents, Darnella Rushing and Aaron, and both parents' appointed attorneys appeared. The child was declared to be a deprived child and her custody was awarded to the State Department of Social and

Rehabilitation Services (SRS) with authority to place the child in the physical custody of Darnella. As to Aaron, it was ordered:

"6) That Aaron Rushing shall participate in counseling and parent education if he wishes to be considered for custody of his daughter.

"7) That Aaron shall be allowed reasonable visitations."

SRS placed Lakesha in Darnella's physical custody on July 4, 1981, a month after the June 2 hearing.

On October 30, the court held another evidentiary hearing. Aaron appeared only by and through his appointed attorney. This was not the same lawyer who appeared for Aaron on June 2. Apparently a replacement of counsel for Aaron had occurred. The trial court found Darnella had failed to comply with the June 2 orders concerning her. It was ordered that the physical custody of the child be returned to SRS.

An evidentiary review hearing was held on January 15, 1982. Aaron appeared only by and through his then (his third) appointed attorney. The journal entry of that hearing recites the entry of the various orders made at the June 2, 1981 hearing. Explicitly included in these are the two mentioned orders concerning Aaron. Nowhere in its findings and orders is there recitation of Aaron's compliance or noncompliance with the two June 2 orders. A further review hearing on April 12, 1982 was ordered. The record on appeal does not reveal that this further hearing was held.

An amended petition seeking severance of the parental rights of both Darnella and Aaron was filed on January 20, 1982. The evidentiary hearing on it was held on June 11. Aaron did not appear in person; he appeared only by and through his appointed attorney. Thereafter, on September 2, the trial judge filed a memorandum decision and on September 17, a journal entry in accord with the memorandum decision was filed.

In sum, by his memorandum decision and journal entry, the trial judge found the evidence presented on June 11 insufficient to establish Darnella was unfit and refused severance of her parental rights. As to Aaron, the trial judge said only this in his memorandum decision:

"I find, however, that the State has sustained its burden of proof by clear and convincing evidence that Aaron Rushing is an unfit person to continue as a parent for Lakesha Rushing, and that it is therefore in the best interest of said child that the parental rights of Aaron Rushing be permanently severed.

. . . .
"[T]he court makes the following findings:

. . . .
"3. That Aaron Rushing is found to be an unfit person to have parental rights to Lakesha Rushing, and his parental rights are, therefore, permanently severed."

In the journal entry it is said:

"1) That the alleged natural father, Aaron Rushing, is an unfit parent to have the care and custody of said child and said alleged natural father is hereby permanently deprived of the custody of and parental rights in and to said child; that the memorandum decision of the 2nd day of September, 1982, is incorporated herein by reference."

On October 5, Aaron's appointed "trial" attorney signed and filed a notice of appeal from the severance order memorialized by the September 17 journal entry. Also on October 5, there was entered an order granting Aaron's "trial" attorney leave to withdraw. Appellate counsel for Aaron was appointed October 7.

The issues raised on appeal assert two contentions. First, Aaron was denied effective assistance of counsel at the severance hearing. Second, there was insufficient evidence to support severance of Aaron's parental rights.

To aid understanding of the first contention on appeal, we set forth the entirety of what appears in the transcript of the June 2 hearing concerning Aaron and the conduct of his appointed "trial" attorney.

The first witness was Eleanor Boley, an SRS foster care social worker. This is the whole of Aaron's attorney's cross-examination:

"Q. Have you had any contacts or do you have any knowledge of the natural father Aaron Rushing?
"A. No I don't.
"[AARON'S ATTORNEY]: No further questions."

The second witness was Connie Slaughter, an SRS protective service worker. Within the assistant district attorney's direct examination of her, there was this exchange:

"Q. Let me ask you this Connie, as the S.R.S. worker, protective service worker, assigned to the case have you ever had any contact with Mr. Rushing, Mr. Aaron Rushing?
"A. No I just met him at one of the court hearings that we had.
"Q. Did you speak to him at that time?
"A. I didn't speak to him in the role of a protective service worker, I acknowledged, you know, that he was Lakesha's father but that was about it.

"Q. Has he ever contacted you or S.R.S. or any other agency concerning this child?

"A. Not to my knowledge.

"Q. Do you know from talking with Darnella if he's ever provided any support to this child or to her for this child?

"A. I believe she told me that he hasn't.

"Q. Did he ever come forward to you or anyone that you're aware of seeking or asking any semblance of concern for this child?

"A. The only time that I'm aware is when he came to [the June 2, 1981] court hearing."

Following cross-examination by Darnella's attorney, Aaron's attorney stated, "I have no questions."

At the conclusion of Slaughter's testimony, a recess was taken. Immediately thereafter, this transpired:

"THE COURT: At this time I think there's a request from the attorney of the natural father?

"[AARON'S ATTORNEY]: Yes Your Honor, at this time having talked to the parties and the prospective witnesses that will be called and from the evidence that we've already heard I don't believe that there's any testimony that I would be able to rebut having not talked to my client. I have no information from him. Service has been approved already on him. At this time I would ask that I be given leave by the court to absent myself from the rest of the hearing. I don't feel that it's necessary as I will not be presenting any witnesses in his favor and I will not have any evidence to rebut on the information that is given to the court today.

"THE COURT: Is severance also being asked against the father?

"[ASSISTANT DISTRICT ATTORNEY]: Yes.

"THE COURT: If that's your request and there are no objections by any of the parties I will let you leave.

"[AARON'S ATTORNEY]: Thank you Your Honor."

The next witness was Kathleen Anderson, a Families of Wyandotte County therapist. Her testimony was followed by testimony of Darnella, called as a witness by the State. Darnella testified both as a witness for the State and on her own behalf. Following examination by the assistant district attorney, her attorney and Lakesha's guardian ad litem, she was again examined by the assistant district attorney. Within this last examination there were these questions and answers:

"Q. Darnella, is Aaron Rushing the father of Lakesha?

"A. Yes he is.

"Q. Lakesha is almost three, is that correct?

"A. Yes.

"Q. Has he ever supported that child in any way?

"A. When Lakesha was born me and Aaron was together and Aaron did his part when we was together but as soon as we separated he didn't do nothing else.

"Q. How long is that?

"A. Lakesha's going on three and me and him have been broke up almost two years.

"Q. Has he given you any money in the last two years?

"A. He hasn't done anything. His mother has done — has bought a few things and the rest me and Marie has done.

"Q. Has he provided any clothing?

"A. Nothing.

"Q. Food?

"A. Nothing.

"Q. Presents?

"A. Nothing.

"Q. Cards?

"A. Wait, hold it. When he was living with his mother and she would come over he would see her but as far as doing something for her no but he would be there and she would see him, you know. If she were to see him she would probably know that was Aaron.

"Q. Where is he right now?

"A. He's in Shreveport, Louisiana.

"Q. Do you expect him to provide any support for this child?

"A. Have I expected him to?

"Q. Do you think he will in the future?

"A. Well he hasn't done nothing in the past so I doubt he'd do anything in the future.

"Q. Do you want him to?

"A. If it's a forced thing or if it's something that's going to bring more trouble to me as it did, fist fight or whatever problems, I would prefer for him to stay away like he has done."

The only other evidence presented was testimony of Darnella's mother and an aunt of Darnella's.

Before us, the parties take it for granted that because of the K.S.A. 38-820 mandate that he be represented by counsel, Aaron was entitled to effective assistance of counsel. We agree.

Effective assistance of counsel cases sometimes arise in a due process context. Apparently most such cases arise in a Sixth Amendment context. While the case before us is not a criminal prosecution, we are not asked to and we see no justification to decline application of Sixth Amendment right to effective assistance of counsel law and yardsticks to this parental severance case.

Effective assistance of counsel is a subject addressed in Kansas appellate court opinions. Representative of these are *State v. Tyus*, 232 Kan. 325, 331-332, 654 P.2d 947 (1982), and *Schoonover v. State*, 2 Kan. App. 2d 481, 582 P.2d 292, *rev. denied* 225 Kan. 845 (1978). Aside from what is found in these cases, it

happens that the United States Supreme Court has recently addressed the subject in *United States v. Cronic,* _____ U.S. _____, 80 L.Ed.2d 657, 104 S.Ct. 2039 (1984), and *Strickland v. Washington,* _____ U.S. _____, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).

### Within *Cronic* are found these statements:

"[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. . . . There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.

"Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." _____ U.S. at _____, 80 L.Ed.2d at 667-68.

### Within *Strickland,* it is said:

"[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. . . . [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled. . . .

. . . .

". . . '[T]he right to counsel is the right to the effective assistance of counsel.' [Citation omitted.] Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. . . . Counsel . . . can . . . deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance' . . . .

"The Court has not elaborated on the meaning of the constitutional requirement of effective assistance in the latter class of cases — that is, those presenting claims of 'actual ineffectiveness.' In giving meaning to the requirement, however, we must take its purpose — to ensure a fair trial — as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

. . . .

". . . Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. . . .

"[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of

considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." _____ U.S. at _____, 80 L.Ed.2d at 691-94.

*Cronic* and *Strickland* teach presently pertinent lessons. The purpose of the effective assistance of counsel right is to afford to the party a fair trial. One element of a fair trial is subjection of trial evidence to adversarial testing; the trial must be a reliable adversarial testing process. Whether there is "actual ineffectiveness" need not be decided where there is complete denial of counsel or "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." As we see it, it is possible to say that failure to subject the prosecution's case to meaningful adversarial testing is another way of saying failure to place the prosecution on strict proof.

To us, it is patent that the "mid-trial" withdrawal of Aaron's "trial" attorney from participation in the severance hearing, effectively ratified by the trial judge's approval thereof, constituted denial of counsel by the act of both the attorney and the court. By that judicially approved act of the attorney, Aaron was deprived of meaningful adversarial testing of the State's case. Our decision is fortified by our conclusion that proof of Aaron's parental unfitness was marginal at best, virtually all of that proof was presented through Darnella's testimony in the absence of the attorney, and from the record it must be concluded the attorney made absolutely no argument to the trial judge concerning the sufficiency of the evidence to establish Aaron's alleged unfitness.

Under the circumstances of this case we conclude the order severing Aaron's parental rights must be reversed.

In view of our decision on the effective assistance of counsel issue, we find it inappropriate to address the sufficiency of evidence issue. The State's evidence must be tested first.

Neither party has questioned our jurisdiction to review the effective assistance of counsel issue on the ground it was not an issue raised in the trial court and is first raised on appeal. We are of the view that when the attorney sought the trial judge's leave to be excused from the hearing, the question of denial of assistance of counsel to Aaron was sufficiently raised.

Reversed and remanded for a new trial.