NOT DESIGNATED FOR PUBLICATION

No. 128,143

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of E.L.-C. and V.C., Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD MACIAS, judge. Submitted without oral argument. Opinion filed July 3, 2025. Affirmed.

*Jordan E. Kieffer*, of Jordan Kieffer, P.A., of Wichita, for appellant natural mother.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before WARNER, C.J., CLINE and COBLE, JJ.

PER CURIAM: The appellant, whom we call Mother, challenges the district court's decision to terminate her parental rights involving two of her natural children. She raises two arguments on appeal: She contends that her attorney provided ineffective assistance of counsel when he did not move to set aside the district court's decision after learning that Mother had been hospitalized at the time of the termination hearing. She also argues the State did not present sufficient evidence at the hearing that she was an unfit parent or that this unfitness was unlikely to change in the foreseeable future, and she challenges the district court's conclusion that terminating her parental rights was in the children's best interests. After thoroughly reviewing the record and the parties' arguments, we affirm the district court's judgment.

1

In April 2021, police officers were called to Mother's house due to a disturbance. After investigating and speaking to some of Mother's children, officers arrested Mother on an outstanding warrant and placed all four of Mother's children into police protective custody. We use pseudonyms for the children in this opinion, referring to them from oldest to youngest as Anne, Jane, John, and David.

The State filed a child in need of care (CINC) petition two days later, alleging that—according to both daughters—the disturbance was caused when Mother had pushed Anne and held her down on a bed, restraining her by the neck. Jane explained that Mother started the argument over a cellphone.

The State alleged that—again, according to both daughters—Mother had been keeping the children from school for multiple weeks because she believed people were "trying to kill them." Mother "made them move out of their house and into [a] hotel room, so that they could hide from Mother's delusions." Mother would also call both daughters "murderers" and believed that they were "'plotting' against her."

The State also alleged that maternal relatives had informed investigators that Mother physically abused Anne and possibly the other children, would yell at the children, and would not allow them to leave the house. The maternal relatives also expressed concern that Mother had been abusing prescription pain medications after she began taking them for a back injury in the past.

The State also included information from Mother's perspective in the petition. According to Mother, Anne had started the fight that originally led to law enforcement being called. Mother agreed that they were staying at a hotel because she believed someone was following her, but Mother said that the children refused to go to school and

also that they had not been able to go to school after Anne tested positive for COVID. Mother also stated that she "'did not necessarily call the children murderers'"; she just believed that they were knocking on walls and then pretending that they were not knocking. Mother denied any substance abuse. And the petition did not include any statement by Mother on the alleged physical abuse.

Finally, the State alleged in its petition that Mother stated that she was diagnosed with depression, anxiety, and post-traumatic stress disorder (PTSD). Mother explained that she had previously taken "Celexa and 'bupuren'" but she had since stopped taking these medications. Mother, both daughters, and maternal relatives all agreed that Mother's recent paranoia appeared to have started after a trip to Mexico in early 2021.

The district court entered an order of temporary custody in May 2021, placing all four children in the custody of the Kansas Department for Children and Families (DCF) in out-of-home placement.

The district court then held an adjudication and disposition hearing in June 2021, where Mother personally appeared with her attorney and submitted a statement of no contest to the State's petition. The court then concluded the children were in need of State care, finding by clear and convincing evidence that the children were

- without adequate parental care, control, or subsistence and the condition was not due solely to the lack of financial means of the children's parents or other custodian;

- without the care or control necessary for the children's physical, mental, or emotional health;

- not attending school as required by Kansas compulsory education laws; and

3

- residing in the same residence with a sibling or another person under 18 years of age who had been physically, mentally, or emotionally abused or neglected.

The case remained active for three years. During that time, the children lived with their Maternal Grandparents. David, who had a different father than the older three children, was reunited with his father in 2022 (though he remained in contact with his siblings), and his CINC case was closed in January 2023. Anne turned 18 years old as the case was pending. So, the only questions remaining in the case were Mother's parental rights regarding Jane and John.

Mother's participation varied during the three years the case remained pending. The district court held regular permanency or review hearings in November 2021, March and August 2022, and January and June 2023. Mother did not appear at hearings in November 2021, March 2022, and January 2023. According to reports from the foster-care agency—Saint Francis Ministries (SFM)—Mother also did not appear at a hearing in September 2022.

In October 2023, the State filed a motion requesting a finding of unfitness and an order terminating Mother's parental rights. The case was scheduled for a routine review hearing on October 20, 2023—the day after this termination motion was filed. Mother did not appear at this hearing, and the district court continued the case to be set for a hearing on the motion for finding of unfitness and termination of parental rights.

In February 2024, the district court continued the case again because Mother wished to retain a new attorney—her third court-appointed attorney during the case. The district court appointed Mother's third counsel in February 2024 and set the case for a status conference in March 2024, followed by an evidentiary hearing on the State's termination motion in May.

4

At the status conference in March, the district court allowed Mother to appear via Zoom but ordered that she must appear in-person for the upcoming evidentiary hearing on the State's motion. But on the day of that hearing—May 7, 2024—Mother did not appear in-person or via Zoom. The district court questioned Mother's newest counsel about her absence; the attorney stated that he had not heard from Mother recently. The State reminded the court that Mother had appeared at the previous hearing via Zoom and the court "was very clear with her that she must attend today's date in person." And Mother's attorney agreed that Mother received proper notice of the evidentiary hearing.

The district court then granted the State's request to present its case via proffer. The State offered its motion for finding of unfitness and termination of parental rights, along with a report prepared by SFM. Mother's counsel did not wish to call any of the State's witnesses for cross-examination and did not have any witnesses or evidence to introduce on Mother's behalf.

The district court stated that it had reviewed the documents submitted by the State. It found by clear and convincing evidence that Mother was unfit to parent the children based on K.S.A. 38-2269(b)(3), (b)(7), (b)(8), (c)(2), and (c)(3) and that this unfitness was unlikely to change in the foreseeable future. The court highlighted Mother's lack of participation throughout the case and her aggression with case workers and her previous attorneys. The court also noted that Mother did not follow case plans and did not modify her behavior toward the children. And the court found that it was in Jane's and John's best interests to terminate Mother's parental rights, emphasizing that the case had been pending for three years. Mother appeals.

DISCUSSION

A parent has a constitutionally protected liberty interest in their relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before a district court may terminate a person's parental rights, Kansas law requires a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the children's best interests. K.S.A. 38-2269(a), (g)(1).

Due to the fundamental nature of a parent's rights, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the evidence was sufficient to support the court's decision—that is, whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit—both at the time of the hearing on the State's termination request and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds its broad latitude if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies

6

on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

The district court found that the State had proven by clear and convincing evidence that Mother was unfit to parent Jane and John—both at the time of the hearing and for the foreseeable future—based on K.S.A. 38-2269(b)(3) (Mother's opiate abuse), (b)(7) (failure of agencies' efforts to rehabilitate the family), (b)(8) (lack of effort to adjust her circumstances), (c)(2) (lack of meaningful visitation or communication with the children), and (c)(3) (not completing the reintegration plan). The court then found that it was in the children's best interests to terminate Mother's parental rights.

Mother challenges the sufficiency of the evidence supporting these findings, as well as the court's conclusion that it was in Jane's and John's best interests to terminate her parental rights. She also argues for the first time on appeal that her attorney provided ineffective assistance of counsel when he did not contact the court two weeks after the hearing when Mother informed him that the reason she had not been at the hearing was because she had been in the hospital on the day of the hearing. We address this argument first and then turn to Mother's evidentiary claims.

1. *Mother does not make the necessary showing of prejudice to prevail (or warrant an evidentiary hearing) on her ineffective-assistance-of-counsel claim.*

Mother asserts in her appellate brief that she was unable to attend the final evidentiary hearing in this case because she had been in the hospital and unable to make decisions at that time. She states that she informed her attorney about her hospitalization about two weeks after the hearing. It is unclear from Mother's brief what the nature of that conversation was or whether Mother asked the attorney to take any action based on this information. Mother now argues, for the first time on appeal, that her attorney provided deficient representation when he did not ask for a continuance when Mother

7

was not present at the hearing and did not file a motion to reconsider or set aside the district court's ruling once he learned of Mother's hospitalization.

Before considering this argument, we comment on the state of the appellate record for this issue. There is no evidence or documentation in the record regarding Mother's hospitalization—likely because Mother did not inform her attorney that she had been in the hospital until weeks after the district court terminated her parental rights. Neither Mother nor her attorney filed any requests with the district court that would have created an evidentiary record. The result is that Mother's brief is the sole source of information concerning her ineffective-assistance claim.

Likely recognizing that this court lacked a sufficient evidentiary record to address her claim, Mother first raised this argument in a motion as this appeal was pending and requested that her case be remanded for an evidentiary hearing. Our court's motions panel denied Mother's request on the showing Mother made in her motion. In her brief, Mother has offered little more beyond the allegations in her previous motion—that her attorney had not taken any steps, either at the hearing on the State's termination motion or later, to bring information regarding her hospitalization before the district court.

Our court has long recognized that "parents are entitled to effective assistance of counsel during a termination of parental rights hearing." *In re D.H.*, 54 Kan. App. 2d 486, 499, 401 P.3d 163 (citing *In re Rushing*, 9 Kan. App. 2d 541, 545, 684 P.2d 445 [1984]), *rev. denied* 307 Kan. 987 (2017). In *Rushing*, we determined that the same principles that underlie the Sixth Amendment right to assistance of counsel for criminal cases apply to the statutory right to counsel in cases involving the termination of parental rights. 9 Kan. App. 2d at 545-46. Specifically, the *Rushing* court considered the applicability of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

8

Under *Strickland*, a party alleging the ineffective assistance "must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial." *Edgar v. State*, 294 Kan. 828, 837, 283 P.3d 152 (2012) (citing *Strickland*, 466 U.S. at 687). *Cronic*, meanwhile, created a "narrow exception" to the need to show prejudice under the second prong, creating a presumption of ineffectiveness reserved for situations when the assistance of counsel was denied entirely or denied at a critical stage of the proceedings. 466 U.S. at 658-59. The parties agree that *Strickland* provides the appropriate framework for addressing Mother's claim because Mother was represented by counsel—the question is whether her attorney's performance fell below an objective standard of reasonableness and adversely affected her case.

As we have noted, Mother raises her ineffective-assistance-of-counsel claim for the first time on appeal. And appellate courts generally do not consider an allegation of ineffective assistance of counsel when it is raised for the first time on appeal. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). This is because claims involving an attorney's actions, strategies, and explanations involve factual inquiries that require evidentiary testing. For this reason, our Supreme Court has explained that—in the context of criminal cases—the factual aspects of such a claim "'require that the matter be resolved through a K.S.A. 60-1507 motion or through a request to remand the issue to the district court for an evidentiary hearing under *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 (1986).'" *Salary*, 309 Kan. at 483.

To date, our court has not remanded for a procedure akin to a *Van Cleave* hearing in cases involving the termination of parental rights. *In re J.A.*, No. 125,516, 2023 WL 3775096, at *8 (Kan. App. 2023) (unpublished opinion). But several panels have analyzed an ineffective-assistance claim under *Strickland* and ultimately determined that a remand for an evidentiary hearing on parents' ineffective-assistance claims was not necessary. See, e.g., *In re F.G.*, No. 114,602, 2016 WL 4259928, at *7-8 (Kan. App.

9

2016) (unpublished opinion); *In re A.B.*, No. 111,483, 2015 WL 249768, at *6-9 (Kan. App. 2015) (unpublished opinion); *In re J.W.*, No. 106,561, 2012 WL 2621154, at *2-6 (Kan. App. 2012) (unpublished opinion). We reach the same conclusion here.

To prevail on her claim, Mother must show that (1) her attorney provided unreasonably deficient representation and (2) that representation was sufficiently serious to prejudice the defense and deprive her of a fair hearing. See *Edgar*, 294 Kan. at 837. In other words, she must demonstrate that there is "a reasonable probability [that] a different result would have been achieved in the absence of the deficient performance." *In re D.H.*, 54 Kan. App. 2d at 498 (citing *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 [2015]; *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 [2014]).

Mother contends that her attorney should have asked for a continuance at the time of the hearing or filed a motion to reconsider or set aside the termination of her parental rights once he learned of Mother's hospitalization. There is nothing in the record to support Mother's arguments about why she did not appear or to aid our understanding as to what discussions Mother may or may not have had with counsel about filing a motion to set aside or reconsider the termination. And Mother does not attempt to fill this gap with any explanation of what evidence she may offer at an evidentiary hearing. She does not explain why the attorney was required to ask for a continuance or file a motion to reconsider or set aside the termination.

But even if we were to assume that Mother's attorney should have taken some action when he learned that she had been hospitalized during the hearing, Mother does not address *Strickland*'s prejudice inquiry at all. That is, she does not explain why a different result would have been achieved if her attorney had sought to set aside the termination order. And she does not discuss any evidence that would be presented in a *Van Cleave*-type hearing to establish why the district court would have withdrawn its ruling. Instead, Mother merely argues that she "was working on court orders"—implying

10

that this evidence could have been offered at a new evidentiary hearing. But as we discuss later in the opinion, the district court considered extensive evidence regarding Mother's actions responding to the case plan over the three years this case had been pending. And Mother does not offer any further explanation of how her presence at the hearing, either through her testimony or in providing insights that would aid her attorney, would have altered the district court's decision.

Because Mother has not shown that any action or omission by her attorney affected the outcome of her case, we find her claim of ineffective assistance of counsel to be unpersuasive.

2. *The State proved sufficient facts for the district court to find by clear and convincing evidence that Mother was unfit to parent Jane and John and would remain unfit for the foreseeable future.*

Mother next challenges the sufficiency of the evidence to support the district court's finding that Mother was unfit to parent her children and would remain unfit for the foreseeable future.

As we have noted, before terminating a person's parental rights, a district court must determine whether that person is unfit to parent—that is, whether they engage in conduct or has a condition that renders them "unable to care properly for a child"—and whether that unfitness is "unlikely to change in the foreseeable future." K.S.A. 38-2269(a). To assess a person's fitness as a parent, the district court considers, among other things, the several factors listed in K.S.A. 38-2269(b) and (c). Depending on the facts and circumstances of each case, evidence of any of these factors can be enough to support a finding of parental unfitness. K.S.A. 38-2269(f).

A court evaluates the "foreseeable future" from a child's perspective. *In re R.S.*, 50 Kan. App. 2d at 1117. This is because children have a different perception of time—for a

child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4). Among other things, a court can look to a parent's past pattern of conduct as a predictor of how the parent will conduct themselves in the foreseeable future. 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

The district court found that the State had shown Mother was unfit to parent her children under K.S.A. 38-2269(b)(3), (b)(7), (b)(8), (c)(2), and (c)(3). Mother challenges these findings, pointing out that she "completed a substance abuse assessment, parenting classes, anger management, a psychological assessment and therapy" and maintained communication with SFM. But as the State rightly points out, the information submitted to the district court, while including the information that Mother provides, tells a very different story when considered as a whole. And it is not the role of an appellate court to reweigh the evidence presented to the district court. Nor are we in a position to reassess witnesses' credibility. Rather, we must determine whether there is evidence in the record to support the district court's finding that Mother is presently unfit to care for the children and that this unfitness will continue for the foreseeable future. We conclude there is evidence to support the district court's findings.

*K.S.A. 38-2269(b)(3)* allows a court to consider whether a parent is using "intoxicating liquors or narcotic or dangerous drugs" in a way that renders them unable to care for their children. The record reflects that Maternal Grandmother and maternal aunts had expressed concern to caseworkers that Mother was abusing prescription pain medication. Based on this concern, the court ordered Mother to complete required urinalysis and hair-follicle tests—but Mother did not submit to the required drug testing six times in 2021 or nine times in 2022. She did not complete any drug testing during 2023. In fact, Mother submitted to only two drug tests over the course of those three years, and in those tests, she tested positive for hydrocodone and opiates once.

12

Mother claimed that she completed a substance-abuse assessment with a therapy provider in 2022, but she refused to sign the release form to allow the provider to share her health information with the caseworkers. So no one could verify whether Mother had completed the assessment nor confirm whether Mother was complying with any recommendations of such assessment. In February 2024, caseworkers again asked Mother to sign the release forms so that they could confirm whether Mother completed this case task, and Mother refused.

This evidence supports the district court's finding that Mother was not taking the necessary steps to treat her abuse of opiates. Indeed, instead of showing a pattern of improving her conduct, the record demonstrated that Mother was becoming less and less willing to submit to drug tests as the case proceeded—supporting the district court's finding that Mother's unfitness due to her opiate abuse was unlikely to change for the foreseeable future.

*K.S.A. 38-2269(b)(7)* allows a district court to consider whether a parent's actions were undermining "reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The record demonstrates that caseworkers provided Mother with referrals and information about resources for multiple issues she struggled with, including her mental health, housing, and completing case-plan tasks. Unfortunately, the proffered facts show that Mother did not take advantage of these efforts, and rehabilitation of the family was not accomplished.

Regarding her mental health, Mother told caseworkers that she was diagnosed with depression, anxiety, and PTSD. Mother stated she had completed a court-ordered psychological evaluation with a therapy provider but, much like her substance-abuse assessment, Mother did not sign a release of information for caseworkers to obtain those records, so the provider would not release any information regarding evaluation or treatment. And by September 2021, Mother had stopped attending counseling and was no

longer taking medication. SFM offered to connect her with hospitals where she could be screened and get medication restarted, but Mother refused.

As for her housing, Mother experienced intermittent homelessness during this case. At Mother's request, caseworkers called local homeless shelters to see if Mother could be admitted, but several of the shelters refused based on "past problems" with Mother. Caseworkers told Mother about resources for housing assistance. Once Mother obtained housing again, she refused to share her address with SFM.

SFM summarized its efforts as: (1) offering referrals to complete court orders, case-plan tasks, an achievement plan, and drug screening; (2) coordinating visits with her children; (3) providing Mother with Section 8 and Second Chance Housing resources; and (4) reviewing case-plan tasks with Mother. Unfortunately, although Mother had these services available to her, the record before the district court showed that she did not take advantage of many of them and outright refused some of SFM's efforts regarding treatment for her mental health.

*K.S.A. 38-2269(b)(8)* considers "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." The proffered facts show that Mother did not make any consistent or long-term changes to her circumstances, conduct, or conditions to meet the needs of her children. Specifically, Mother did not address the issues that brought her children into custody to begin with, did not maintain contact with SFM, never maintained consistent employment, and moved out of the state in late 2023.

Mother's mental health appeared to be a central cause of the issues that brought the children into the State's care in 2021. Mother was keeping the children from attending school and moved them into a hotel based on her concerns that someone was stalking her.

14

Mother's paranoia extended to her relationship with her children, as she would call both daughters "murderers" and believed that both daughters were "'plotting' against her."

Throughout the case, Mother repeatedly reported to caseworkers that the children were being harassed, but she either would not or could not say who was doing such a thing. Maternal Grandparents and both daughters each confirmed that nobody was harassing the children. Yet from the time that the CINC case was filed through October 2023, Mother had filed 14 petitions for protection from stalking orders or petitions for protection from abuse against many different people. Mother had also contacted authorities—from local law enforcement to the FBI National Tip Line—claiming that people were following her, wiretapping her phone, hacking into her email, and sex-trafficking Anne (the oldest daughter).

During the first year of the CINC case, Mother agreed that she struggled with her mental health. But beginning in 2022, Mother began denying that she had any mental-health concerns at all, stating that she did "not believe she needs to address her mental health" and refused to do any further clinical assessments or treatments.

Mother also did not maintain consistent employment, and although she reported to SFM that she was employed at various points throughout the case, she would not provide the names of her employers or proof of employment. And Mother reported to SFM that she moved to Oklahoma at some point in 2023, but she would not give SFM an address. She later told SFM in December 2023 that she had moved to Texas—but again would not give SFM an address or even share what town she had moved to in Texas. The record detailing these actions—moving out of the state where her children were in care and not providing a way of contacting her—supported the district court's finding of unfitness.

*K.S.A. 38-2269(c)(2)* allows a court to consider whether a parent has maintained "regular visitation, contact or communication with the child[ren] or with the custodian of

15

the child[ren]." The proffered facts show that Mother did not maintain regular visitation, contact, or communication with the children or SFM during the case.

Mother had hour-long visits with the children in 2022, but Anne and Jane began refusing to meet with her, saying they feared Mother and her actions. And at visits, Mother had "acted out in front of the children by yelling and verbally attacking the case team." The children's therapist recommended that visitation stop until a parent-child assessment could be completed. The court ordered a parent-child assessment, but the assessment was never completed, so SFM suspended visitation based on the therapist's recommendation. Mother never had any visits with the children again.

The record also reflects that it was often difficult for caseworkers to communicate with Mother throughout the case. Mother changed her phone number and email address, moved multiple times to different states, and refused to share her new contact information. The last time SFM was able to contact Mother was in February 2024. SFM attempted to contact Mother seven more times between this call and the evidentiary hearing in May, but Mother never responded to any of SFM's calls or emails. In short, the record supports the district court's findings that Mother had not been in consistent contact with either her children or the caseworkers as this case was ongoing.

*K.S.A. 38-2269(c)(3)* considers Mother's actions concerning the court-ordered case plan. The record presented to the district court showed that Mother did not complete many of her case-plan tasks and refused to provide any verification for the few tasks that she claimed she did complete. On appeal, Mother argues that the district court's ruling did not account for the progress she had made. But our review of the record shows that although she took some steps early in the case, her progress slowed and then regressed in many ways over the years the case was pending. There was evidence in the record to support the district court's finding of unfitness based on this subsection.

16

Mother points out that there was some evidence in the record that ran counter to the district court's findings. She notes that she "completed a substance abuse assessment, parenting classes, anger management, a psychological assessment and therapy" and maintained communication with SFM. But it is not the role of an appellate court to reweigh the evidence presented. Instead, we are called on to see whether the district court's findings are supported by the record presented. See *In re D.H.*, 54 Kan. App. 2d at 496-97; see also K.S.A. 38-2269(f).

Likewise, Mother's patten of conduct demonstrated that as the case progressed over three years, she was less likely to engage with her children, communicate with caseworkers, or comply with court-ordered tasks. At the time of the hearing on the State's termination motion, Mother had stopped completing any requested drug tests, denied that she had any mental-health concerns at all, refused to pursue any further evaluations or treatment for her mental health, continued to refuse to sign any release forms for providers, continued to be difficult to contact, and recently moved out of state. Mother now claims that she only needed more time to complete the tasks, but the record does not support this assertion. Given Mother's history of inaction throughout this case and the downward trend in her participation with case tasks, there is evidence in the record to support the district court's finding that Mother's unfitness as a parent will continue for the foreseeable future.

3. *The district court did not abuse its discretion by finding that terminating Mother's parental rights was in the best interests of the children.*

In her final argument, Mother argues that the district court erred when it found that termination of her parental rights was in Jane's and John's best interests. Mother argues that the two children should remain together and because they "had different fathers," they "would not be able to be placed/adopted into the same home following termination." But as the State notes in its brief, the record belies these assertions.

The record shows that Anne, Jane, and John have been living with their Maternal Grandparents since 2021, and Maternal Grandparents were the adoptive resource for the children. David, the youngest son, had a different father than the older three children and was reunited with his father in 2022; his CINC case was closed in January 2023, but he remains in contact with the other children. Thus, it is incorrect to assert that the children would not be placed or adopted into the same home.

Our review of the record demonstrates the reasonableness of the district court's best-interests determination. Jane, who was 14 years old at the time of the termination hearing, had expressed that she did not want contact with Mother and wanted to live with Maternal Grandparents. The guardian ad litem stated at the termination hearing that he had spoken with Jane before the hearing, and she continued in that belief. And John, who was eight years old at the time of the hearing, stated that he enjoys living with Maternal Grandparents; SFM's reports showed he was thriving at school and had lots of friends. The case had been pending for over three years, injecting additional uncertainty into the children's lives as they attempted to adjust and grow. The district court did not abuse its discretion by finding that the physical, mental, and emotional health of these children would best be served by terminating Mother's parental rights.

We affirm the district court's judgment.

Affirmed.